UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, FOOTLOOSE MONTANA, FRIENDS OF THE CLEARWATER, GALLATIN WILDLIFE ASSOCIATION, GLOBAL INDIGENOUS COUNCIL, THE HUMANE SOCIETY OF THE UNITED STATES, INTERNATIONAL WILDLIFE COEXISTENCE NETWORK, NIMIIPUU PROTECTING THE ENVIRONMENT, SIERRA CLUB, TRAP FREE MONTANA, WESTERN WATERSHEDS PROJECT, WILDERNESS WATCH, and WOLVES OF THE ROCKIES, | Case No. 1:21-cv-00479-CWD **MEMORANDUM DECISION AND ORDER** |
| Plaintiffs, | |
| v. | |
| BRAD LITTLE, Governor of Idaho; ED SCHRIEVER, Director of Idaho Department of Fish & Game; and DERICK ATTEBURY, DAVE BOBBITT, GREG CAMERON, LANE CLEZIE, RON DAVIES, DON EBERT, TIM MURPHY, Members of the Idaho Fish and Wildlife Commission, | |
| Defendants. | |

MEMORANDUM DECISION AND ORDER - 1

**INTRODUCTION**

Plaintiffs, a diverse group of conservation and animal welfare organizations, allege that the Governor of Idaho, the Director of the Idaho Department of Fish and Game, and members of the Idaho Fish and Game Commission have implemented a regulatory scheme that continue to authorize, and have expanded, the ability to trap and snare gray wolves. Specifically, Plaintiffs contend that Idaho's gray wolf trapping and snaring laws and regulations are reasonably certain to cause the unlawful "take" of grizzly bears and Canada lynx in violation of Section 9 of the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544.

The Court has before it Plaintiffs' motion for temporary restraining order and preliminary injunction to halt Defendants' continued, and recently expanded, authorization of wolf trapping and snaring in Idaho's grizzly bear habitat,[1] which comprises the Panhandle, Clearwater, Salmon, and Upper Snake regions. Plaintiffs contend immediate relief prior to a decision on the merits is essential to avoid future unlawful trapping and snaring of grizzly bears in violation of the ESA. Plaintiffs' motion is most specifically related to the expansion of Idaho's gray wolf trapping laws and regulations.

---

[1] The motion before the Court does not implicate Plaintiffs' second cause of action, which alleges Idaho's wolf trapping and snaring laws and regulations violate the ESA because they cause the unlawful take of Canada lynx.

**MEMORANDUM DECISION AND ORDER - 2**

The Court heard oral argument on Plaintiffs' motion and took it under advisement. After considering the parties' written briefs, arguments, and relevant authorities, the Court will deny Plaintiffs' motion.

## FACTS

The grizzly bear, Ursus arctos horribilis, was listed as threatened under the ESA in 1975, in response to dwindling numbers resulting in an estimated population in the lower 48 states of 700 to 800 individuals. To aid grizzly bear recovery, the United States Fish and Wildlife Service ("FWS") designated six areas as grizzly bear recovery zones. Idaho encompasses portions of four designated recovery zones in the Selkirk, Cabinet-Yaak, Greater Yellowstone, and Bitterroot ecosystems. Grizzly Bear Recovery Zones and Estimated Distributions—U.S. Fish and Wildlife Serv., SPECIES STATUS ASSESSMENT FOR THE GRIZZLY BEAR IN THE LOWER-48 STATES: A BIOLOGICAL REPORT 62 (Jan. 2021).[2] Idaho's grizzly bear populations are concentrated in and around northern Idaho's Cabinet-Yaak, Selkirk, and Greater Yellowstone ecosystems. Plaintiffs claim grizzly bears have "increasingly been confirmed near" the Bitterroot ecosystem. However, Defendants deny that there are any known grizzly bear populations in the Bitterroot ecosystem, and contend that, while bears have been observed there, they are likely transient young males that have not remained in the ecosystem.

---

[2] The map depicting Grizzly Bear Recovery Zones referenced in Plaintiffs' complaint and Defendants' answer may be found on the FWS's website, www.fws.gov, and accessed at the following link: https://ecos.fws.gov/ServCat/DownloadFile/196991. The same map is attached as Ex. A to the Scrimshaw Declaration. (Dkt. 6-13.)

Grizzly bears are habitat generalists that may, at times, be found on private land. However, private land is often unsuitable habitat for grizzly bears in Idaho and, because of the potential for bear/human conflict, grizzly bears found on private land are often removed. *See* Scrimshaw Decl., Ex. G. (Dkt. 6-13) (table documenting grizzly bear/human conflicts in Idaho between 2009 – 2020). Grizzly bears are also a conservation reliant species. Defendants contend that the State of Idaho has put substantial resources into grizzly bear conservation.

In 2020, two grizzly bears were killed in incidents directly or indirectly involving wolf snares in northern Idaho's panhandle region. Bear number one was a subadult male grizzly. According to the Idaho Fish & Game Report of Investigation, a report was received from a mushroom picker who found a dead grizzly bear on or about May 3, 2020. Niemeyer Decl., Ex. C. (Dkt. 6-11.) The bear was found in a ravine, with a wolf snare "very tightly around its neck and another wolf snare wrapped around its front left paw." Investigation revealed that the young male grizzly died from an "unlawful wolf snare around its neck." The snares had been set "side by side hanging below a log," and an elk carcass had been left behind the log as bait. The report indicated that the snares were "standard wolf snares with kill springs" that "did not have trap identification tags as required by Idaho state law." It was reported also that the state of the elk remains indicated the snares "had been set quite some time ago," possibly "during the winter," and that the bear had been dead for several days.

The case remains under investigation, with violation charges noted as: "killing of a closed season grizzly bear – a threatened species; wolf trapping during a closed season;

**MEMORANDUM DECISION AND ORDER - 4**

trapping with unmarked traps." Niemeyer Decl., Ex. C. According to Brian Johnson, the investigating officer, the grizzly bear "was captured at a time when there were no open wolf seasons. In addition, these ground snare sets were unlawful in Idaho because they were: (1) set within 30 feet of visible bait (elk parts); (2) they did not contain a breakaway device or a cable stop incorporated in the loop of the snare; and (3) they did not have identification tags indicating they were set by a licensed trapper." Johnson Decl. ¶ 9. (Dkt. 19-3.) Johnson surmised that "[t]he condition of the grizzly bear and other observation of the site also indicated the snares were not checked at least once every 72 hours, and the capture was not reported to the Department as required by Commission rules." *Id.* There remains insufficient evidence to prosecute any person for the violations. *Id*. ¶ 10.

Bear number two was a subadult male bear shot and killed in Boundary County in August of 2020 by a hunter who mistook it for a black bear. Niemeyer Decl., Ex. D. (Dkt. 6-11.)  According to the Idaho Department of Fish and Game Case Report, officer Brian Johnson received a telephone call on August 31, 2020, about a bear that had been shot and killed on trail number 35 above Spruce Lake. *Id.*; Johnson Decl. ¶ 11. The hunter who shot the bear met officer Johnson later that day, and relayed that he mistook the bear for a black bear. Neimeyer Decl., Ex. D; Johnson Decl. ¶ 12. The bear was located and found with a broken wolf snare around its neck, and an ear tag from British Columbia. Neimeyer Decl., Ex. D; Johnson Decl. ¶13. The bear was noted to be an adult male in good physical condition. Neimeyer Decl., Ex. D; Johnson Decl. ¶ 15.

**MEMORANDUM DECISION AND ORDER - 5**

Officer Johnson reported that the snare "did not contain a breakaway device or a cable stop incorporated in the loop of the snare, which would make it unlawful to place [] in Idaho as a ground set snare. Grizzly bears, especially younger males, may traverse wide areas, and the…snaring of this grizzly bear could have occurred in Canada, Idaho, or Montana." Johnson Decl. ¶ 16. The individual who killed the grizzly bear was issued a citation for killing the grizzly bear during closed season. Niemeyer Decl., Ex. D. Johnson Decl. ¶ 17.

Plaintiffs reference also an incident years ago involving a third bear caught in a trap meant for a wolf. On or about May 25, 2012, regional wildlife biologist Bryan Aber, who was employed by the Idaho Department of Fish and Game, captured one subadult female grizzly in a foothold trap (Minnesota Brand MB-750) that he had set to capture wolves for radio collaring near Hatchery Butte on the Caribou-Targhee National Forest. Aber Decl. ¶ 4. (Dkt. 19-1.) The capture occurred at a time closed to non-agency wolf trapping in a large block of national forest land, and at a time still closed under current seasons. The bear suffered minor swelling and a small (less than 1 inch) scratch on the bear's trapped front left foot. *Id.* ¶ 6. The bear was radio-collared as Bear 706, and she became a subject of the Grizzly Bear Study Team's ongoing research and monitoring for grizzly bears in the Greater Yellowstone Ecosystem. *Id.* The bear was monitored, and in 2014, reports indicated she was observed with two yearlings. *Id.* at ¶ 8.[3]

---

[3] Plaintiffs' complaint and brief reference only three grizzly bears found in Idaho that were captured by snares meant for wolves.

As further evidence of bears caught in traps or snares intended for other animals, Plaintiffs include a report from the State of Montana, which shows that, between 2010 and 2018, seven grizzly bears were caught in traps intended for coyotes and wolves. Scrimshaw Decl., Ex. D. (Dkt. 6-13.) Four of the seven reports indicate grizzly bears were caught in traps intended for coyotes. All four bears were immobilized and released. Three other reports involving wolf traps indicate: (1) "2 grizzly toes [found] in trap;" (2) "immobilized and relocated [bear]…survived and bear cast its collar following year;" and (3) "unverified reports of a grizzly running around with a trap on its foot."

Defendants' data on wolf trapping, which goes back to 2011, does not reveal a single incident where a grizzly bear was caught in a legal wolf trap set under the regulatory scheme Plaintiffs challenge, and Defendants have no record of any grizzly bear known to have been trapped incidentally to otherwise lawful, state-licensed wolf trapping by private individuals in Idaho. Decl. of Oelrich ¶ 6. (Dkt. 19-5.) *See also* Decl. of Boudreau ¶ 35. (Dkt. 19-2, "Idaho does not have a record of a radio-collared grizzly being trapped or snared by a private individual in Idaho, with or without trapper reporting.")

**Wolf Trapping Laws and Regulations**

Effective July 1, 2021, Idaho readopted all prior existing rules for wolf trapping and consolidated them into the rule chapter applicable to the trapping of other species. Idaho further adopted legislation, contained in Idaho Senate Bill 1211 (2021), which resulted in the amendment of the Idaho Fish and Wildlife Commission's Wolf Season

Proclamation for 2021 – 2022. The specific laws and regulations challenged are set forth below.

Idaho Code § 36-201(3) establishes that "[w]olf trapping season shall be open year-round on all private property, so long as individuals are in compliance with the permission requirements of Idaho Code § 36-1603 before entering private property." Previously, wolf trapping and snaring on private property was prohibited between April 1 and September 9 annually. Compl. ¶ 60. (Dkt. 1.)

Idaho Code § 36-408 specifies that "[a]ll Idaho wolf tags will be valid for hunting, trapping, and snaring in any unit when seasons are open at the time of take. There shall be no limit to the number of wolf tags that an individual can purchase. All appropriate fish and game education requirements must be met." Previously, Idaho limited wolf tags to 15 wolves per season per person. Compl. ¶ 60.

Idaho Code 36-1107(c), pertaining to control of depredation of wolves on livestock and domestic animals, was amended to allow that "[w]olves may be disposed of by any federal agency, state agency, private contractor, political subdivision of the state of Idaho, or agency of another state…." *See also* Idaho Code § 36-1107(d). Plaintiffs contend these rules "authorize a new program of state-sponsored, private-contractor wolf killing in partnership with Idaho's Wolf Depredation Control Board." Compl. ¶ 60.

In addition to state law, the Idaho Fish and Wildlife Commission adopts wolf hunting and trapping seasons and general rules yearly, and has done so since 2011. Decl. of Oelrich ¶ 9, Exs. A – I. (Dkt. 19-5.) The 2021-22 Gray Wolf Hunting & Trapping Seasons & General Rules were published by the Idaho Department of Fish and Game.

**MEMORANDUM DECISION AND ORDER - 8**

The 2021-22 rules state that there is no daily or season limit on wolves, but that no person may take more wolves than the number of legal tags they possess. Scrimshaw Decl., Ex. E. (Dkt. 6-13.) Wolf tags bought with a trapping license are valid for the trapping year, which is July 1 - June 30. Persons trapping for wolves must possess a valid trapping license, and obtain a Wolf Trapper Education course validation. *Id.*

Wolf trappers may use only ground sets for trapping gray wolves, which are defined as "any foothold trap or snare originally set in or on the land, including any traps elevated up to a maximum of thirty-six (36) inches above the natural ground level. Size restrictions on body-gripping traps mean they are not allowed for wolves." *Id.* It is illegal to "place any ground set snare without a break-away device OR cable stop incorporated within the snare loop;" "[t]o place any foot-hold trap with an inside jaw spread greater than nine (9) inches;" and "[t]o place any ground set body-gripping trap that has a maximum jaw opening when set, of greater than seven and one-half inches measured from the inside edges of the body gripping portions of the jaws, within thirty (30) feet of any bait, lure or other attractant." *Id.*

The rules state that the "[n]on-target capture of endangered species (such as grizzly bear and lynx) or other federally protected animals is not authorized for trappers targeting wolves, and non-target captures are subject to federal prosecution." *Id.* Wolf trappers are advised to "avoid locations (such as the Panhandle and Greater Yellowstone Area) at times when endangered species may be captured (such as when grizzly bears are out of dens). Trappers who capture endangered species should contact the nearest Fish

and Game Office for help with safe release of the animal or other assistance…." *Id.* Wolf traps must be visited "at least once every seventy-two (72) hours…." *Id.*

The Idaho Fish and Wildlife Commission adopted different regulations applicable to private, versus public, lands. *Id*. On private land, wolf hunting season dates were between July 1, 2021 – June 30, 2022. Hunter use of private land must comply with trespass laws, as well as any specific restrictions private property owners may have for hunting on their property. Regulations also dictate whether foothold traps or snares are allowed depending upon the season dates and the location of the private land. Regulations applicable to wolf hunting on public lands between July 1, 2021 – June 30, 2022, varied depending upon the area and season.

The 2021 legislation did not result in changes to wolf trapping seasons previously set by the Commission for public lands. Trever Decl. Ex. A. (Dkt. 19-4.) Trapping seasons on public lands in the Selkirk/Cabinet-Yaak and Greater Yellowstone Recovery Areas remain restricted to the period between November 15 – March 31, based on alignment with grizzly bear denning periods. In other Government Management Units (GMUs) with longer public land seasons, snaring is not allowed outside of Nov. 15 – March 31 (trapping restricted to foothold only for earlier fall seasons). *Id.*; Oelrich Decl. ¶ 8.

In sum, the recently enacted state laws and Idaho Fish and Wildlife Commission regulations effective July 1, 2021, and applicable to the 2021-2022 wolf trapping season, not only re-adopted previous laws and regulations related to trapping and snaring of wolves, but also expanded prior regulations to authorize: (1) a permanent, year-round

**MEMORANDUM DECISION AND ORDER - 10**

wolf-trapping season on private property, whereas previously wolf trapping was prohibited statewide between May 1st and September 9th;[4] (2) an unlimited number of wolf tags per person, up from the previous cap of 15 wolf tags per person; and (3) state-sponsored, private-contractor wolf eradication in partnership with the Idaho Wolf Depredation Control Board.

## LEGAL STANDARD

### 1.    Standard for Issuing an Injunction

The ESA's citizen suit provision allows private parties to enforce the ESA's substantive provisions under certain circumstances. 16 U.S.C. § 1540(g). The Court may "enjoin any person, including the United States and any other governmental instrumentality or agency…who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1).

The purpose of a preliminary injunction is to preserve the status quo and prevent the "irreparable loss of rights" before a final judgment on the merits, while the purpose of a temporary restraining order is to preserve the status quo until a hearing may be held on the appropriateness of a preliminary injunction. *See Textile Unlimited, Inc. v. A. BMH and Co.*, 240 F.3d 781, 786 (9th Cir. 2001); *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1130–31 (9th Cir. 2006). Both remedies are extraordinary and should not be

---

[4] There was no change to the wolf trapping season on public land effected by the change in state law. The 2021 – 2022 Gray Wolf Hunting & Trapping Seasons and General Rules allowed trapping on public lands between November 15 – March 31.

**MEMORANDUM DECISION AND ORDER - 11**

awarded as a matter of right, but only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Under the *Winter* test,[5] a party is entitled to a preliminary injunction if it demonstrates: (1) a likelihood of success on the merits and a possibility of irreparable injury, or (2) the existence of serious questions on the merits and a balance of hardships tipping in its favor. *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1400 (9th Cir. 1992). These are not two independent tests, but the extremes of the continuum of equitable discretion. *Id*.

The *Winter* test, however, is not the test for injunctions under the ESA. *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987) (citing *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978)); *Friends of the Earth v. United States Navy*, 841 F.2d 927, 933 (9th Cir. 1988). In cases involving the ESA, Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests. *Friends of the Earth*, 841 F.2d at 933 (quoting *Marsh*, 816 F.2d at 1383). The "language, history, and structure" of the ESA demonstrates Congress' determination that the balance of hardships and the public interest tips heavily in favor of protected species. *Tennessee Valley Auth.*, 437 U.S. at 174; *Friends of the Earth*, 841 F.2d at 933; *Marsh*, 816 F.2d at 1383.

Nevertheless, these cases do not stand for the proposition that courts no longer must look at the likelihood of future harm before deciding whether to grant an injunction

---

[5] The standards for both a temporary restraining order and a preliminary injunction are the same. *All. for Wild Rockies v. Pierson*, 550 F. Supp. 3d 894, 898 (D. Idaho 2021).

under the ESA. The Court is not obligated to grant an injunction for every violation of the

law. *Tennessee Valley Auth*., 437 U.S. at 193. Plaintiffs must make a showing that a

violation of the ESA is at least likely in the future. *Cf. Amoco Production Co. v. Village

of Gambell*, 480 U.S. 531, 545 (1987) (in NEPA case, if injury to the environment "is

sufficiently likely, the balance of harms will usually favor the issuance of an injunction").

In other words, the plaintiff must show "[a] reasonably certain threat of imminent harm to

a protected species" before an injunction may be issued. *Marbled Murrelet v. Pac.

Lumber Co*., 83 F.3d 1060, 1066 (9th Cir. 1996). Proof of a threat of extinction to the

species is not required, but a plaintiff must, at a bare minimum, establish a definitive

threat of future harm based on something other than mere speculation. *Nat'l Wildlife

Fed'n v. Burlington N.R.R.,* 23 F.3d 1508, 1512 n.8 (9th Cir. 1994); *Center for Biological

Diversity v. Otter*, No. 1:14-cv-258-BLW, 2016 WL 233193 *4 (D. Idaho Jan. 8, 2016).

## 2.     Endangered Species Act Prohibitions on Take

Congress enacted the ESA in 1973 to "provide for the conservation, protection,

restoration, and propagation of species of fish, wildlife, and plants facing extinction."

*Wyo. Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224, 1231 (10th Cir. 2000) (quoting S.

Rep. No. 93-307, at 1 (1973), reprinted in 1982 U.S.C.C.A.N. 2989). The ESA provides

various levels of protection depending upon how a species is classified. The three ESA

classifications are: (1) endangered, (2) threatened, and (3) experimental populations. *See*

16 U.S.C. §§ 1538(a), 1539(j). "Endangered" species are entitled to the highest level of

protection. *See Animal Welfare Inst. v. Martin*, 588 F.Supp.2d 70, 97-98 (D. Me. 2008)

(internal citation omitted). A threatened species is "any species which is likely to become

**MEMORANDUM DECISION AND ORDER - 13**

an endangered species within the foreseeable future throughout all or a significant portion

of its range." 16 U.S.C. § 1532(20).

The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap,

capture, or collect, or attempt to engage in any such conduct." *Id*. § 1532(19). When a

species is listed as endangered, it is unlawful for any person to "take any such species."

16 U.S.C. § 1538(a)(1)(B). Regulations promulgated by the United States Department of

Interior forbid the taking of grizzly bears, except in certain specified circumstances. 16

U.S.C. § 1538(a)(1)(G), 50 C.F.R. § 17.40(b)(1)(i)(A). Thus, the mere trapping of a

grizzly bear, even if released alive, constitutes a taking under § 9 of the ESA. *See Center*

*for Biological Diversity v. Otter*, No. 1:14-cv-258-BLW, 2016 WL 233193 *4 (D. Idaho

Jan. 8, 2016). *See also United States v. Charette*, 893 F.3d 1169, 1171 (9th Cir. 2018)

(citing regulations applicable to take of grizzly bears). Neither party disputes here that

there was a "taking" of the two bears found in Idaho in 2020, constituting a violation of

Section 9 of the ESA. *See Center for Biological Diversity v. Otter*, 2016 WL 233193 *4.[6]

---

[6] Although Plaintiffs include a reference to the trapping of the female grizzly in 2012 by Idaho
Fish and Game officials, "Federal, State, or Tribal authorities may take grizzly bears for scientific or
research purposes, but only if such taking does not result in death or permanent injury to the bears
involved." 50 C.F.R. § 17.40(b)(1)(ii)(D). While the female bear caught by regional wildlife biologist
Bryan Aber was caught in a snare intended for capturing and radio collaring wolves, the capture did not
occur during trapping season and it occurred incidental to research studies. The bear was released without
permanent injuries.

**MEMORANDUM DECISION AND ORDER - 14**

## ANALYSIS

Plaintiffs contend that Idaho's wolf trapping and snaring laws and regulations "are reasonably certain to continue to result in take of threatened species," and that the authorization of the same has caused, and is reasonably certain to cause, the take of grizzly bears in violation of the ESA. Plaintiffs rely upon evidence of past take reported in Idaho which concerned two deceased bears reported in May and August of 2020 with snares around their necks. Plaintiffs contend the two instances of prior take are indicative of likely future take, especially considering the recent expansion of the wolf trapping and snaring regulations which will now permit trapping and snaring on private lands in the summer months, when bears are likely to be seeking food before hibernation.

Defendants maintain that Plaintiffs' case rests on speculation, as there has been no report in the past decade of a licensed wolf trapper complying with Idaho trapping seasons and rules having captured a grizzly bear. Accordingly, Defendants argue Plaintiffs have not established a likelihood of success on the merits, because the record currently before the Court does not establish a causal link between Idaho's laws and regulations and the take of the two bears. Defendants explain that Plaintiffs' reliance on past take is insufficient to show that irreparable harm is likely if Idaho's laws and regulations are not enjoined, because neither bear was taken by an Idaho licensed wolf trapper utilizing legal traps and snares authorized by Idaho's laws and regulations.

## 2.    Causation

The Court finds Plaintiffs have not shown they are likely to succeed on the merits of their claim based solely upon the two incidents of past take documented in Idaho.

Defendants' decision to authorize and now expand the ability of Idaho hunters to trap and snare gray wolves on private land in the summer months does not appear reasonably related to the take of the two grizzly bears. As Defendants point out, Plaintiffs have no evidence that either bear was snared by a lawful wolf snare or trap set in compliance with Idaho's regulatory scheme. Further, it was not certain that the second bear, which was shot and killed in August of 2020, was snared in Idaho, as the bear had British Columbia ear tags.

Plaintiffs insist that reports from other jurisdictions demonstrate that non-target species, including grizzly bears, are routinely captured by traps and snares meant for wolves or coyotes. Plaintiffs claim this evidence establishes that grizzly bear snaring incidents are the rule rather than the exception. For instance, Plaintiffs point to Montana's report of seven grizzly bears caught in traps intended for wolves and coyotes, as well as reports from Canada regarding the same. They also point to the female grizzly caught in the foothold trap by Idaho Fish and Game wolf researchers in 2012,[7] and the likelihood that grizzly bear captures are going unreported.

But to show irreparable harm and obtain an injunction, Plaintiffs must show that future ESA violations are likely if Idaho's existing laws and regulations remain in place. *Center for Biological Diversity v. Otter*, 2018 WL 539329 at *3. Although Plaintiffs' argument is emotionally appealing, and it is easy to presume that snares harm bears as well as many other animals unintentionally caught by a snare or trap meant for a wolf, the

---

[7] *But see* note 6.

**MEMORANDUM DECISION AND ORDER - 16**

Court cannot conclude on the basis of the evidence before it that take of grizzly bears is reasonably likely to occur as a result of Idaho's laws and regulations permitting the trapping and snaring of gray wolves. Evidence currently in the record indicates other jurisdictions have different regulatory frameworks than Idaho. Decl. of Boudreau ¶¶ 28, 29. (Dkt. 19-2.) And, there is always the danger that grizzly bear captures are unreported. *Otter*, 2018 WL 539329 at *3.[8] But injunctions "must be based on evidence not speculation." *Id.* Here, Plaintiffs have not established that irreparable harm is likely to occur prior to a court order on the merits absent enjoining of Idaho's laws and regulations.

Plaintiffs' final argument is that Idaho's recent changes, effective July 1, 2021, to the wolf trapping and snaring rules which established a permanent, year-round trapping season on private property; the ability to purchase an unlimited number of wolf tags; and the state-sponsored, private-contractor wolf eradication program are reasonably certain to result in the take of grizzly bears. Plaintiffs contend that Idaho's existing laws and regulations "already caus[e] the unlawful capture and killing of grizzly bears," and thus these changes are surely likely to do so in the future given that trapping and snaring devises "are by their nature inherently indiscriminate." Pls.' Mem. at 14. (Dkt. 6-1.)

However, as discussed above, Plaintiffs have not established on this record that

---

[8] Defendants described their research efforts regarding grizzly bears, which involves collaring and tracking bears through telemetry data so as to study their habits and mortality. Decl. of Boudreau ¶ 32. (Dkt. 19-2.) Defendants introduced evidence that they have no record of a radio-collared grizzly bear being trapped or snared by a private individual in Idaho, with or without trapper reporting, and that it actively seeks out and investigates persons who illegally kill grizzly bears for prosecution. Decl. of Boudreau ¶ 35-36. (Dkt. 19-2.)

Idaho's laws and regulations are likely to result in irreparable harm absent a court order. *See Center for Biological Diversity v. Otter*, No. 1:14-CV-258-BLW, 2016 WL 233193 (D. Idaho Jan. 8, 2016) (finding injury to Canada lynx fairly traceable to the state's laws and regulations regarding trapping and snaring of furbearing animals as well as coyotes and wolves, because licensed trappers using legal traps had "taken" four lynx over the last three years).[9] Plaintiffs essentially seek to bootstrap their argument regarding past take under the laws and regulations in effect prior to July 1, 2021, in an attempt to enjoin the expanded laws and regulations. But, having failed to establish that irreparable harm is likely under the prior laws and regulations, the same evidence cannot support Plaintiffs' claim that Idaho's expanded laws and regulations should be preliminarily enjoined.

Moreover, Defendants directly refute Plaintiffs' contention that the changes will result in more traps, and thus more snared bears. Compl. ¶ 62. Defendants explain that actual data reflects no increase in wolf mortality from July 1, 2021, to December 31, 2021, after the rule changes went into effect. Oelrich Decl. ¶ 18; Rather, despite the change in the rules Defendants have reported no captures of grizzly bears since July 1, 2021. Defs.' Mem. at 2. (Dkt. 19.) Other than speculation, the Court finds Plaintiffs have not demonstrated a possibility of irreparable harm in the form of take of grizzly bears if

---

[9] The Court granted the defendants' motion to reconsider in light of new evidence, which established that the taking of three of the four captured Canada lynx were exempted pursuant to an incidental take statement issued by the Fish and Wildlife Service applicable to trappers targeting bobcats. No. 1:14-CV-258-BLW, 2018 WL 539329 (D. Idaho Jan. 24, 2018). That left one past violation not exempted, involving the capture of a Canada lynx by a trapper targeting wolves. The Court reversed its prior decision, and granted summary judgment to the defendants, finding that a single violation was insufficient to support continued injunctive and declaratory relief when there was no showing of a reasonable likelihood of future ESA violations affecting the Canada lynx if the existing hunting and trapping laws and regulations remained in place. 2018 WL 539329 at *3.

Idaho's expanded laws and regulations remain in place pending a resolution on the merits.

Nor does the case law Plaintiffs cite in support of their motion persuade the Court otherwise. In *Animal Welfare Inst. v. Beech Ridge Energy*, 675 F. Supp. 2d 540, (D. Md. 2009), the court halted a 40 turbine project known as Beech Ridge in West Virginia because of its potential to kill the endangered Indiana bat. On summary judgment, the court concluded that there was a "virtual certainty" that Indiana bats would be harmed, wounded, or killed imminently based upon compelling evidence that Indiana bats behave no differently than other bat species that have wound up dead after flying into wind turbines. *Beech Ridge*, 675 F. Supp. 2d at 578.

In *Loggerhead Turtle v. Cnty. Council of Volusia Cnty*., Fla., 896 F. Supp. 1170, 1180 (M.D. Fla. 1995), the plaintiffs alleged that the county's permitting of beech driving "results in and will continue to result in the death and injury of sea turtle" hatchlings. *Loggerhead Turtle*, 896 F. Supp. at 1175. Loggerhead sea turtles are a "threatened" species under the ESA, and the Green sea turtle is "endangered" for the "breeding colony populations in Florida." *Id*. at 1172-73. In that case, the evidence was uncontroverted that driving a vehicle on the beach where protected sea turtles nest and lay eggs resulted in, and would continue to result in, the death and injury of sea turtles. The court granted a limited injunction pursuant to the ESA prohibiting night driving on the beach, as well as parking and driving in a particular conservation zone. *Id*. at 1182. The court found that actual harm had already occurred, and that vehicles driving on the county's beaches will likely continue to destroy emergent and pre-emergent sea turtle hatchlings. *Id*. at 1181.

**MEMORANDUM DECISION AND ORDER - 19**

At this stage of the proceedings, the Court finds these two cases are not analogous. Plaintiffs have not presented evidence in support of their motion that grizzly bears have been reported caught in lawfully set wolf snares or traps by hunters complying with Idaho's regulatory scheme. *See Center for Biological Diversity v. Otter*, 1:14-cv-258-BLW, 2016 WL 233193 (D. Idaho Jan. 8, 2016) (finding injury fairly traceable to the state's laws and regulations). This is in contrast to the evidence before the courts in both *Loggerhead Turtle* and *Beech Ridge*, where the instrumentality of the harm was obvious and it was clear that the defendants' conduct was responsible.

For instance, in *Loggerhead Turtle*, the County's ordinance permitting vehicular access to beaches, particularly at night, resulted in the death of protected sea turtles. 896 F.Supp. at 1182. And in *Beech Ridge*, scientific evidence regarding the presence of protected Indiana bats within the area of the project site, coupled with uncontroverted evidence that wind turbines kill bats, established the requisite likelihood of future harm to support issuance of an injunction. 675 F.Supp.2d at 580-1.

Here, in contrast, the scientific evidence is more nuanced. Idaho has a specific regulatory scheme applicable to the trapping of wolves. For instance, Idaho regulates the type of trap or snare that can be set as well as its placement, among other requirements. While the Court has no doubt that, in general, wolf traps and snares can also capture bears (and any other animal that innocently wanders into the trap), Plaintiffs have not met their burden of showing that hunter compliance with Idaho's wolf snaring and trapping laws and regulations, either before or after July 1, 2021, is reasonably likely to result in the taking of grizzly bears.

**MEMORANDUM DECISION AND ORDER - 20**

Rather, at this stage, this case appears to be more analogous to *Nat'l Wildlife Fed'n v. Nat'l Park Serv.*, 669 F.Supp. 384 (D. Wyo. 1987). There, the plaintiffs challenged the Park Service's decision to keep Fishing Bridge Campground, located in Yellowstone National Park, open at a reduced level during an environmental review period. Plaintiffs claimed the decision to allow tourists in the campground would have a negative effect upon grizzly bears and result in a taking under the ESA. The Park Service had adopted an interim management plan to reduce conflicts between humans and grizzly bears. One component of the interim management plan involved educating the thousands of tourists who visit Yellowstone Park annually to take commonsense measures to decrease and eliminate incidents with grizzly bears.

During the first season of operation under the plan, there were no bear mortalities. The court was "hard pressed to understand how, under such circumstances, the continued operation of Fishing Bridge [Campground]…would constitute a taking." *Nat'l Wildlife*, 669 F.Supp. at 389. The court concluded that, "it is not the campground that presents the greatest threats to the grizzly bear; rather, it is those people who, for whatever reason, blatantly choose to disregard the National Park Service's rules and regulations." *Id.* at 392.

Similar here are Defendants' uncontroverted declarations that the snares found on the two grizzly bears in 2020 were not set lawfully by hunters complying with Idaho's laws and regulations applicable to the trapping and snaring of wolves. In the case of the bear shot and killed in Boundary County in August of 2020, it was not even certain that the bear was snared in Idaho, as the bear had British Columbia tags. Plaintiffs' statements

**MEMORANDUM DECISION AND ORDER - 21**

of harm are "general allegations" tied to their theory that snares and traps are inherently harmful to all species, including grizzly bears, who innocently wander into them. But this is not enough to show a reasonable likelihood that grizzly bears will be taken as a consequence of compliance with Idaho's laws and regulations pertaining to the lawful trapping and snaring of wolves. *See, e.g., Friends of the Clearwater v. Higgins*, 472 F. Supp. 3d 859, 876 (D. Idaho 2020), *aff'd, Friends of Clearwater v. Higgins*, 847 F. App'x 394 (9th Cir. 2021) (finding the plaintiffs' claims of harm speculative when no bears or lynx were identified in the project area).

"Plaintiffs must show more than a possibility of harm to an endangered species, they must show a likelihood of harm." *Higgins*, 472 F.Supp.3d at 876. Plaintiffs have not met this low bar, because they have not established on this record that the lawful placement of wolf traps and snares under Idaho's prior and current laws and regulations is reasonably likely to result in future take of grizzly bear.

## CONCLUSION

The Court finds Plaintiffs have not shown a reasonable likelihood of success on the merits of their ESA claim regarding the unlawful taking of grizzly bears. On this record, Plaintiffs have not shown a likelihood of irreparable harm caused by the continued authorization, and current expansion, of Idaho's wolf trapping and snaring laws and regulations. Plaintiffs' generalized allegations of harm based solely upon the emotionally appealing argument that traps and snares harm bears do not demonstrate likely irreparable injury caused by compliance with the challenged laws and

**MEMORANDUM DECISION AND ORDER - 22**

regulations.[10] Accordingly, the Court will deny Plaintiff's motion for a preliminary injunction.[11]

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

Plaintiffs' Motion for Preliminary Injunction (Dkt. 6) is **DENIED**.

The parties are to submit a proposed joint litigation plan and discovery plan on or before **September 19, 2022**. The Court will set a telephonic scheduling conference by separate notice.

DATED: August 22, 2022

Honorable Candy W. Dale
United States Magistrate Judge

---

[10] Further proceedings may provide for a different result on a motion for summary judgment, however.

[11] Defendants included additional arguments in support of their opposition to Plaintiffs' motion. Having found the requisite causal connection to support issuance of a preliminary injunction lacking on the record before it, the Court declines to address Defendants' additional arguments.

**MEMORANDUM DECISION AND ORDER - 23**