RAÚL R. LABRADOR
ATTORNEY GENERAL
STATE OF IDAHO
SCOTT L. CAMPBELL
Chief, Energy & Natural Resources Division
KATHLEEN E. TREVER (Idaho Bar No. 4862)
OWEN H. MORONEY (Idaho Bar No. 9553)
Deputy Attorneys General
600 S. WALNUT STREET
P.O. BOX 25
BOISE, ID 83707
TELEPHONE: (208) 334-3715
E-Mail: kathleen.trever@idfg.idaho.gov
owen.moroney@idfg.idaho.gov

*Attorneys for State of Idaho Officials*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

CENTER FOR BIOLOGICAL DIVERSITY, et al.,

Plaintiffs,

vs.

BRAD LITTLE, Governor of Idaho; JIM FREDERICKS,* Director of Idaho Department of Fish and Game; and DERICK ATTEBURY, DAVE BOBBIT, GREG CAMERON, JORDAN CHEIRETT,* RON DAVIES, DON EBERT AND TIM MURPHY, Members of the Idaho Fish and Game Commission,

Defendants,

and IDAHO TRAPPERS ASSOCIATION *et al*,

Defendant-Intervenors.

Case No. 1:21-cv-00479-CWD

IDAHO OFFICIALS' REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT [Dkt. 59]

Under Fed. R. Civ. P. 25(d), Jim Fredericks and Jordan Cheirett are substituted as parties in their official capacities.

## Table of Contents


**1. Plaintiffs do not show reasonable certainty of imminent harm to listed grizzly bears in traps that would actually be set in Idaho to target wolves in compliance with state law.** . 3

a. Imminence....3

b. Predicting and assessing future harm: probability and scope....5

c. Superficiality and inadmissibility of proffered expert opinions....7

**2. Plaintiffs' requested relief is inappropriate under the U.S. Constitution and the ESA.** 10

a. Anti-commandeering....10

b. Causation and redressability....11

**3. Conclusion**.... 12

**1. Plaintiffs do not show reasonable certainty of imminent harm to listed grizzly bears in traps that would actually be set in Idaho to target wolves in compliance with state law.**

Plaintiffs do not substantiate ongoing ESA violation or ongoing harm. They cannot prevail unless they show an imminent violation of the ESA by Defendant Idaho officials (Idaho). *See Ex Parte Young*, 219 U.S. 123 (1908). To obtain injunctive relief in a §9 ESA citizen suit, they must also show reasonably certain threat of imminent harm to listed grizzly bearsburling, not merely "potential injury" or non-injurious violation. *Marbled Murrelet v. Babbit*, 83 F.3d 1060, 1066 (9th Cir. 1996). While Plaintiffs' argument may be emotionally appealing, their proffered evidence is speculation that falls well short of their ESA burden.

a. Imminence

"Imminent" means "ready to take place; near at hand." *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 785 (9th Cir. 1995). Plaintiffs do not show an imminent ESA violation by Idaho or a finding of imminent harm to listed grizzly bears related to Idaho's regulation of wolf trapping. Since Idaho wolf trapping seasons opened in 2011, there are zero reported non-target grizzly bear captures in traps set in compliance with Idaho law, and no harm to any individual bear or the greater ESA-listed entity. *See* Dkt. 60-1 ¶15. As to other trapping frameworks, the only known harmful trapping in Idaho in the last 30 years of *any* non-target grizzly bear by *any* trapper, government or private[1] is one, perhaps two, instances of unlawful snaring. *See id.;* The only other known non-target grizzly bear capture in Idaho involved IDFG's capture of a bear in an MB-750 foothold trap in 2012 during wolf monitoring. Plaintiffs assert potential harm to this bear, based on general allegations of harm in traps. Dkt. 70 ¶12. Specific

[1]This history includes agency trapping for wolf, black bear, mountain lion, and agency and private trapping for coyote. If coyote trapping were considered analogous, statewide allowances in Idaho for coyote trapping have for decades been greater than those provided under the expanded allowances for wolf trapping effective as of 2021. Dkt. 60-2 ¶46.

facts refute this notion: this bear was collared, recaptured and examined seven years later in 2019, and seen with two yearlings in 2014. Dkt. 19-1 ¶¶6-9.

Plaintiffs rely on general allegations: baits and lures that Idaho wolf trappers may choose to use are able to attract grizzly bears; and foothold traps and snares that Idaho trappers may choose to use are able to capture grizzly bears. *See Ps' Response* (Dkt. 68) at 6-8.[2] Plaintiffs base "capability" of capture (*id.* at 8-9) on: IDFG's non-injurious capture in May 2012,[3] a 1987 USDA capture in Montana in a foothold trap model (#114 Newhouse) not known to be used in 2023 by Idaho wolf trappers, [4] and a 2014 USFWS Biological Opinion (Dkt. 68-4 at 98) concerning potential non-target capture of -listed species during USDA wildlife damage management activities in Idaho. The BiOP discussed USDA capture history in the region for the 20 years preceding the BiOp, identified captures in Wyoming and Montana, and stated "there is no reason to suggest [take] could not happen in Idaho." Dkt. 68-4 at 94.

Notably, there has been no non-target USDA take of grizzly bears in Idaho while trapping for any species from at least 1993 to the present.[5] Dkt. 52-5 at 119-20; Dkt. 60-2 ¶45. Although not described, the model(s)/configuration(s) of foothold trap in the reported incidents is likely not to be used by Idaho trappers in 2023. *See* Dkt. 6 at 68 (Niemeyer Deposition describing USDA traps and improbability of their use in Idaho wolf seasons). In addition, the purpose for USDA foothold trapping and snaring area is distinguishable and trapping practices and gear

---

[2]Idaho refers to ECF page numbers rather than printed page numbers for ECF filings.
[3]Since 2013, the season for this location (public land) is foothold only (no snaring) and restricted to Nov. 15 – Mar. 31. Dkt. 60-1 ¶4. Snaring remains prohibited in both private and public land seasons between April 1 and Oct. 9, and in most units remains closed until Nov. 14. *Id.*
[4] *Trever 2nd Decl.* Dkt. 63) at 67-68 (Niemeyer Depo. discussion of 1987 agency capture).
[5]The USFWS Incidental Take Statement authorized 4 grizzly bear captures, including one fatality in Idaho for 2014-2034, finding this amount of take would not appreciably reduce the likelihood of the survival and recovery of grizzly bears. (Dkt. 52-5 at 123). Zero take has occurred to date.

allowances are unlikely to correlate with current Idaho trapping rules and practices. See Dkt. 63 at 73; Dkt. 60-2 ¶¶38, 42-44. Plaintiffs fail to adduce specific facts that connect the dots between "potential capture" and "reasonably certain threat of imminent harm" to actual grizzly bears in actual traps during Idaho wolf trapping seasons.[6] *See Marbled Murrelet*, 83 F.3d at 1066.

b. Predicting and assessing future harm: probability and scope

In determining whether probability of imminent future harm rises to "reasonable certainty," Idaho agrees that past take is instructive of *similar* take in the future. *See Nat'l Wildlife Fed. of Burlington Northern R.R., Inc.*, 23 F.3d 1508, 1512 (9th Cir. 1994). However, Plaintiffs ignore an important corollary— the absence of past take is also instructive, particularly for well-studied grizzlies. *See Idaho's Opening Br.* (Dkt. 60) at 15-6. The Ninth Circuit, persuaded by an absence of take, denied injunctive relief that would have applied measures in addition to a railway's cleanup efforts after 7 grizzly bears attracted to grain spills were killed by train strikes. "The fact that no bears have been killed by BN trains in three years supports an inference that the cleanup was effective." *Burlington*, 23 F.3d at 1512.

Plaintiffs take a broad view of what past take is "instructive" for predicting future take. They present 25 non-target grizzly bear captures over a multi-decade period by government and private trappers targeting wolf and coyote in Idaho, Montana, Wyoming, and British Columbia and Alberta. Dkt. 68 at 16-17. On a parallel path, Plaintiffs seek to analogize all non-target captures of black bears by recreational trappers in Idaho targeting all species. *Id.* at 5.

In doing so, Plaintiffs fail to show that non-target captures from other regulatory frameworks are factually similar to the non-target captures in Idaho they seek to predict. *Ctr. for*

---

[6] *Cf. Forest Conservation Council*, 50 F.3d at 788 (imminent threat of reasonably certain harm to listed spotted owls living in area that indisputably would be clearcut as soon as possible).

*Biol. Diversity v. Little,* 622 F.Supp.3d 997, 1007 (D. Idaho 2022). In discovery, Plaintiffs had opportunity to make inquiries about past takings to assess their similarity to wolf trapping seasons. In its opening briefing and *supra* at, Idaho has presented facts and expert opinions explaining why these units are generally dissimilar and vague to be predictive of take and harm in Idaho wolf seasons. Differences include a combination of regulatory frameworks (e.g., differences in seasons, gear restrictions and requirements), size and density of grizzly bear populations, and trapping purposes (agency wildlife damage and monitoring projects) and Idaho recreational wolf trapping preferences. Dkt. 60 at 12 (e.g., contrasting probability of take incidents in British Columbia's different regulatory framework with a 15,000 non-ESA listed grizzly bear population and probability of incidents involving the 100 to 200 grizzly bears that spend all or part of the year in relatively small parts of Idaho).

Proffered expert opinions appear to "phone it in," lacking foundation necessary for F.R.E. 702 admissibility and unhelpful to the trier of fact. Plaintiffs do not genuinely dispute these distinctions. They fail to provide context to support significant expansion of the geography and circumstances on which they  assess future harm in Idaho wolf seasons. This lack of context, and failure to provide correlation to Idaho-specific information about actual grizzly bears and actual recreational wolf trapping, results in meaningless speculation. Plaintiffs' pronouncement of "reasonable certainty" resembles a prediction of reasonable certainty that there will be at least one winner of the Powerball drawing next year, which is decidedly not predictive of a winner from Idaho next month, or of a winner from Caldwell or from Council next week.

Plaintiffs' spaghetti-blender approach does not demonstrate sufficient rationale to find past take from other regulatory frameworks instructive. However, assuming arguendo that the 25 "past take" incidents are similar, once one applies the context for this take — the breadth of trap

nights, grizzly bears, and extent of wolf and coyote traps in agency and private trapping involved across British Columbia, Alberta, Idaho, Wyoming, and Montana over a multi-decade period—Plaintiffs still fall well short of proving reasonable certainty of imminent harm to grizzly bears in Idaho wolf trapping activities.

Neither the ESA nor case law prescribes a percentage or mathematical equation to define "reasonable certainty" relative to the threat of imminent harm to a species. However, Plaintiffs' cited examples are clearly distinguishable from Plaintiffs' construct. *Cf., e.g., Burlington Northern*, 23 F.3d 1508 (considering future harm to 7 grizzly bears where bears had been killed near grain spills along railroad tracks and denying injunctive relief in the absence of take for 3 years subsequently); *Strahan v. Coxe,* 127 F.3d. 155 (1st Cir. 1997) (roughly 50% of the entire population of 300 endangered northern right whales showing evidence of injury from gill nets and lobster pots).

c. Superficiality and inadmissibility of proffered expert opinions

In this case, the future take of consequence is injurious capture in a foothold trap or snare set to target wolves in Idaho in compliance with Idaho's recreational wolf trapping seasons and rules. Despite the opportunity for discovery, Plaintiffs' case remains essentially as it was a year ago –proffered expert testimony that is not grounded with Idaho-specific information, either for direct assessment, or for determining whether potential analogs are in fact similar. In denying preliminary relief, the Court was clear that "general allegations" tied to a theory of the inherent harm of traps was insufficient. *Center for Biol. Div.*, 622 F.Supp. 3d at 1006.

Idaho's Opening brief provided examples from the depositions of Vickers, Servheen, and Proulx and Niemeyer that document the lack of foundation for their opinions in this matter. Dkt. 60 at 12. The testimony of these four experts is an echo chamber discussing some of the same

"details" of the same list of trapping incidents, and opining they illustrate the dangers posed to grizzly bears from wolf trapping and snaring in Idaho. *E.g.*, Dkt. 68-7 ¶22; Dkt. 68-3 ¶22. Yet the entire evidentiary record for the 6 non-target captures in British Columbia and Alberta, where grizzly bears are not ESA-listed is:

> Between 2010 and 2020, at least five grizzly bears in southern BC were caught in wolf foothold traps (with the trap often closing right behind the toes) and had to be released by conservation officers and scientists. Dkt. 52-5 at 44.
> *** *** ***
> In August 2011, Rodtka also noted that a trapper had set 10-15 killing neck snares to capture wolves that had depredated livestock. Within 1 week, 1 whitetailed deer, 1 black bear, and 1 grizzly bear, a threatened species in Alberta, were snared." Dkt. 52-5 at 219 (scientific names omitted).

At the preliminary injunction phase, Idaho identified differences between these provincial frameworks and the framework for Idaho wolf trapping. Dkt. 19-2 ¶28. The Court's denial of preliminary relief identified these differences as a factor in its decision. *Center for Biol. Div.*, 622 F.Supp. 3d at 1006. Like the other 3 Plaintiff opinion witnesses, Mr. Niemeyer's deposition exposed the lack of foundation and unreliable nature of his proffered opinions. For example:

> Q. [ ]I'll be more specific. Do you have any information beyond this report relative to a grizzly bear being killed in a wolf snare in Alberta in 2011?
> [MR. NIEMEYER] A. No.
> Q. Do you know if there is any comparability between the time, place, and circumstances in Alberta and what one might find in Idaho?
> MR. HERNANDEZ: Objection; confusing, ambiguous. You can answer if you can.
> [MR. NIEMEYER] A: It all depends I guess on the region and the season of the year and the regulations within the state of Idaho when snares can legally be set or not. So Canada, everything goes up there pretty much. So I'm not sure I can compare Canada to the lower 48 specifically. Dkt. 63 at 22(Niemeyer Depo.).

Despite this deposition testimony in June 2023, Mr. Niemeyer and the 3 other three witnesses still signed declarations experts relying on the Canada past takes for their opinions of reasonable certainty of imminent take in Idaho, and again without explaining why these takes would be similar to Idaho. At deposition Mr. Niemeyer confirmed he was unaware of trapping regulations for any of the last 20 years for British Columbia, Alberta, Montana, or Wyoming. Dkt. 64 at 96.

The burden is on Plaintiffs, and they fail to meet it with this approach.

Meaningful details in assessing the probability of a non-target grizzly bear in an Idaho wolf set is the specific model of foothold or type of snare and associate devices used, as well as the variation in type of sets a trapper may make based on ground conditions and animal movement patterns. *Dkt. 60-2* ¶¶10-14. Mr. Niemeyer has stated that he relies mostly on my own experience using traps and snares to formulate his opinions. *Dkt. 68-3* ¶6. Notably, while Mr. Niemeyer has used foot snares, he has never set a neck snare for any species. *Id.* He could not name any Idaho trapper currently using neck snares. He could not identify any foothold trap models currently being used by Idaho wolf trappers other than MB-750. Dkt. 63 at 68; *see* 60-2 at 7. Mr. Niemeyer has used only one model of foothold trap since the late 1990s—the McBride EZ Grip, a double long spring trap. Dkt. 63 at 70. He has exclusively used dirt hole sets for trapping wolves, except for one instance of a blind set. *Id.* at 70-71.

Mr. Niemeyer's initial disclosures described bases for opinions regarding unreported take on "conversations" and "decades of engagement" with the trapping community in Idaho. Dkt. 52-5 ¶¶31-32. At his June 2023 deposition, however, he acknowledged he had not had meaningful communications with any Idaho wolf trappers since approximately 2015. Dkt. 63 at 69-70. Mr. Niemeyer could only name one individual trapping in central Idaho (someone who had stopped talking to him), he could not name any trappers who targeted wolves in Greater Yellowstone or the Idaho Panhandle. Dkt. 63 at 69. In September 2023, he re-signed his original disclosure, again describing "conversations" and "decades of engagement" with the trapping community as bases for some of his opinion. Dkt. 68-3 ¶¶31-32.

Despite their ignorance of the current practices of Idaho wolf trappers, Plaintiffs' experts dismiss as "inadequate" Idaho's regulatory and recommended voluntary measures, such as snare

breakaways and stops, improved cable compositions and sizing, and laminated and offset jaws on foothold traps. Dkt. 60-2 ¶10. However, the record before the court indicates use by Idaho trappers, in combination with discretionary choices that trappers make based on local conditions, including temperature, presence of snow, terrain, and other non-target species in the area. *E.g.*, Dkt. 60-2 ¶¶12-15; Dkt. 66-4 ¶14-15. Trappers may also use tools, such as cameras to monitor visitors to the areas where they have set or may set traps. *E.g.*, Dkt. 66-3 ¶8. Although their use may not be universal or appropriate for all trapping scenarios (including snow conditions during the likely denning period), these measures reduce the probability of both capture and harm to a grizzly bear should it be present. Dkt. 60-2 ¶¶10-13. Plaintiffs cannot genuinely dispute use of these measures in Idaho or their effect of reducing potential capture or harm from their use.

**2. Plaintiffs' requested relief is inappropriate under the U.S. Constitution and the ESA.**

a. <u>Anti-commandeering</u>

Under the Supremacy Clause, if Idaho law conflicts with the ESA (i.e., an inability to comply with both state law and the ESA), then the ESA preempts Idaho law. *See Murphy v. Nat'l Collegiate Athletic* Ass'n, 138 S.Ct. 1461, 1477 (2018). However, under the anti-commandeering doctrine of the Tenth Amendment, "'[t]he Federal Government' may not 'command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.'" *Id.* (citation omitted). This doctrine protects the constitutional division between state and federal authorities, promotes political accountability and prevents shifting costs of federal regulation to states without their consent. *See id.* The federal government may allow, but not require, states to implement the ESA or other federal regulatory programs; [7] the anti-

[7]Idaho may, and has, chosen to expend state resources to regulate ESA compliance when doing do sufficiently benefit Idahoans and other state interests. These include regulation to support

commandeering doctrine prohibits the federal government from compelling a state to enact or to prohibit legislation to administer or enforce the ESA. *See id.* at 1478.

Plaintiffs allege that Idaho's regulation of wolf trapping violates the ESA because it "fails to prevent" and "fails to reduce" hypothetical ESA violations, not by state officials, but by private wolf trappers. Dkt. 68 at 5, 11-12. Plaintiffs' requested relief asks a federal court to mandate that Idaho take action to regulate private trapper compliance with the ESA in nearly half of Idaho, unless and until Idaho obtains an incidental take permit. Such relief is constitutionally impermissible under the Anti-Commandeering doctrine.

b. Causation and redressability

When standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," a plaintiff must "adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992). In instances of alleged injury from unlawful regulation, "causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party. . . ." *Id.*

Plaintiffs have repeatedly asserted that ESA violation is underestimated because Idaho trappers fail to make required reports of non-target take of grizzly bears. *E.g.*, Dkt. 70 ¶¶5, 21.[8] Plaintiffs do not adduce facts to show how their alleged harm would be redressed by relief requiring the adoption of more state regulatory restrictions over trappers that do not comply with current ones. As such, Plaintiffs do not show redressability for Article III standing.

ESA incidental take authorization for angler activities catching listed fish and bobcat trappers capturing lynx. *See., e.g., Center for Biol. Diversity v. Otter*, 2016 WL 2332193*2.

[8]Idaho refuted this assertion with various evidence. Dkt. 60-2 ¶¶ 19, 25-28.

Causation is also absent for purposes of Article III standing and ESA statutory liability. Idaho has expressly not authorized capture of grizzly bears in violation of the ESA by private trappers targeting wolves. Dkt. 60-1 ¶6, *Ex. M*. Idaho has also not imposed any gear requirements or restrictions on trappers that have a coercive effect on wolf trappers to take grizzly bears, and has not directly or indirectly "ordered" taking by adopting requirements that make it impossible to comply with the ESA. *See Bennett v. Spear*, 520 U.S. 154, 168-9 (1997).

Idaho's opening brief discussed the Circuit split on vicarious liability for regulatory authority, in which the Ninth Circuit has not engaged. *See* Dkt. 60 at 20-21.[9]

The absence of take since 2011 demonstrates the ability of recreational wolf trappers to conduct activity in Idaho without a reasonably certain threat of imminent harm to grizzly bears. Moreover, if a wolf trapper in Idaho were to make independent choices that resulted in the capture of a listed grizzly bears, that trapper would be subject to prosecution under federal and state law. 16 U.S.C. § 1540; Idaho Code §§ 36-504; 36-1101.

**3. Conclusion**

Based on the absence of genuine issues for trial, and as a matter of law and equity, Idaho asks the Court for summary judgment in its favor.

[9] The slipperiness of the slope of vicarious liability is evident, if one considers an analogous ESA claim regarding state regulation of more common activities with broader participation and social acceptance. A small number of grizzly bears in Idaho and adjacent states have been struck and injured in vehicle collisions by state-licensed and regulated drivers. *Qiu Decl.* (Dkt 54) at 195-6. Applying Plaintiff's logic, an analogous claim would mandate that Idaho end its authorization of driving in half of Idaho, until Idaho obtained an incidental take permit imposing additional operational standards and prescribing vehicle equipment. Absent state-coerced taking of grizzly bears by drivers or trappers, the anti-commandeering doctrine and the ESA do not support vicarious liability or injunctive relief for Idaho regulators of either activity.

Respectfully submitted this 25th day of October, 2023.
*/s/ Kathleen. E. Trever*
Kathleen E. Trever
Deputy Attorney General