UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, FOOTLOOSE MONTANA, FRIENDS OF THE CLEARWATER, GALLATIN WILDLIFE ASSOCIATION, GLOBAL INDIGENOUS COUNCIL, THE HUMANE SOCIETY OF THE UNITED STATES, INTERNATIONAL WILDLIFE COEXISTENCE NETWORK, NIMIIPUU PROTECTING THE ENVIRONMENT, SIERRA CLUB, TRAP FREE MONTANA, WESTERN WATERSHEDS PROJECT, WILDERNESS WATCH, and WOLVES OF THE ROCKIES, | Case No. 1:21-cv-00479-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

Plaintiffs,

v.

BRAD LITTLE, Governor of Idaho; JIM FREDERICK, Director of Idaho Department of Fish & Game; and DERICK ATTEBURY, DAVE BOBBITT, GREG CAMERON, JORDAN CHEIRRETT, RON DAVIES, DON EBERT, TIM MURPHY, Members of the Idaho Fish and Wildlife Commission,

Defendants,

And,

IDAHO TRAPPERS ASSOCIATION, NATIONAL TRAPPERS ASSOCIATION, and FUR TAKERS OF AMERICA, INC.,

Defendant-Intervenors.

**MEMORANDUM DECISION AND ORDER - 1**

## INTRODUCTION

Plaintiffs challenge Idaho Senate Bill 1211, passed and signed into law in May of 2021, and Defendants' continued authorization of wolf trapping and snaring in grizzly bear habitat.[1] Am. Compl. ¶¶ 1 – 6. (Dkt. 49.) Senate Bill 1211 authorized: (1) a year-round wolf trapping season on all private property; (2) issuance of an unlimited number of wolf tags per person; and, (3) the disposal of wolves by private contractors in partnership with the Idaho Wolf Depredation Control Board.[2] The Idaho Fish and Game Commission issues proclamations each year establishing seasons and rules for gray wolf hunting and trapping, and sets season dates applicable to public and private land, including land within grizzly bear habitat. Oelrich Decl. ¶¶ 4 – 6, Ex. M. (Dkt. 60-1.) Plaintiffs argue Idaho's continued authorization and expansion of trapping and snaring in grizzly bear habitat is reasonably certain to cause the unlawful "take" of grizzly bears in violation of Section 9 of the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544.

The Court has before it the parties' and defendant intervenors' cross-motions for summary judgment. (Dkt. 52, 59, 66.) Plaintiffs seek to enjoin Idaho's authorization of recreational wolf trapping and snaring in Idaho's grizzly bear habitat, which includes the Panhandle, Clearwater, Salmon, and Upper Snake regions, until Idaho obtains an

---

[1] Plaintiffs are identified as: Center For Biological Diversity, Footloose Montana, Friends of The Clearwater, Gallatin Wildlife Association, Global Indigenous Council, The Humane Society of The United States, International Wildlife Coexistence Network, Nimiipuu Protecting The Environment, Sierra Club, Trap Free Montana, Western Watersheds Project, Wilderness Watch, and Wolves of The Rockies.

[2] S.B. 1211, 66th Leg., 1st Sess. (Idaho 2011) (enacted), https://legislature.idaho.gov/wp-content/uploads/sessioninfo/2021/legislation/S1211.pdf.

incidental take permit from the United States Fish and Wildlife Service. Idaho opposes an injunction.

The Court conducted a hearing on the motions on January 4, 2024, and thereafter took the motions under advisement. Following the hearing, the parties submitted additional evidence and legal authorities for the Court's consideration. (Dkt. 85, 91, 92, 94.) After careful review of the applicable legal authorities, the parties' memoranda, and the fully developed record now before the Court, Plaintiffs' motion will be granted in part, and Defendants' motions will be denied in part, as explained below.

## FACTS

Idaho objects to some of Plaintiffs' expert witness testimony and various documents relied upon by those Plaintiffs' experts on the grounds that the evidence cannot be presented in a form that would be admissible in evidence. (Dkt. 60-5, 68-1, 73.) *See* Fed. R. Civ. P. 56(c)(2). At the hearing on the cross motions, Plaintiffs insisted they have met their burden on summary judgment even if the Court disregards the expert testimony and documents to which Idaho objects, and asked the Court to focus upon the evidence Idaho introduced. The Court has done so. Accordingly, the Court does not find the particular expert testimony and documents to which Idaho objected material, and the objections are therefore denied as moot. *See* Fed. R. Civ. P. 56(a).

Further, to the extent the parties dispute certain facts, unless otherwise indicated, the Court has set forth in this decision the material facts to which there are no genuine dispute. (*See* Dkt. 53, 61, 62, 66-1, 67-1, 69, 70.)

1.      **Procedural Summary**

On December 6, 2021, Plaintiffs filed their complaint seeking declaratory and injunctive relief against Defendants Brad Little, Governor of Idaho; the Director of Idaho Department of Fish & Game; and Members of the Idaho Fish and Wildlife Commission ("Idaho"). (Dkt. 1.) The complaint challenges Idaho's legislation, signed by Governor Brad Little in May of 2021, authorizing expanded recreational wolf trapping and snaring in habitat occupied by grizzly bears and Canada lynx, both species which are protected under the Endangered Species Act, 16 U.S.C. § 1540 ("ESA").

On December 6, 2021, Plaintiffs filed a motion for temporary restraining order and preliminary injunction to halt Idaho's continued, and then recently expanded, authorization of recreational wolf trapping and snaring in Idaho's grizzly bear habitat, which includes the Panhandle, Clearwater, Salmon, and Upper Snake regions of Idaho. (Dkt. 6.) Following oral argument, the Court issued a memorandum decision and order denying Plaintiffs' motion. (Dkt. 25.) The Court found that, on the record before the Court at that time, Plaintiffs had not demonstrated a likelihood of success on their claim that Idaho's wolf trapping and snaring laws and rules would cause irreparable harm in the form of take of grizzly bears if Idaho's laws and rules remained in place pending a resolution on the merits.[3]

On September 16, 2022, the Idaho Trappers Association, National Trappers Association, and Fur Takers of America sought to intervene as party defendants. (Dkt.

---

[3] The motion did not implicate Plaintiffs' second cause of action, which alleged Idaho's wolf trapping and snaring laws and rules violate the ESA because they cause the unlawful take of Canada lynx.

26.) The Court granted the motion pursuant to the terms agreed upon by the parties. (Dkt. 32.)

On July 7, 2023, Plaintiffs filed an amended complaint removing their second cause of action under the ESA related to Canada lynx. (Dkt. 49.) Following amendment of the complaint, the parties filed their respective motions for summary judgment. (Dkt. 52, 59, 66.)

## 2.   Undisputed Facts

The grizzly bear, *Ursus arctos horribilis*, was listed as threatened in the United States under the ESA in 1975, in response to dwindling numbers resulting in an estimated population in the lower 48 states of 700 to 800 individuals. *Crow Indian Tribe v. United States*, 343 F. Supp. 3d 999, 1004 – 05 (D. Mont. 2018). To aid grizzly bear recovery, the United States Fish and Wildlife Service ("FWS") designated six areas as grizzly bear recovery zones. ENDANGERED AND THREATENED WILDLIFE AND PLANTS; REMOVING THE GREATER YELLOWSTONE ECOSYSTEM POPULATION OF GRIZZLY BEARS FROM THE FEDERAL LIST OF ENDANGERED AND THREATENED WILDLIFE, 82 FR 30502-01 at 30508–09, 2017 WL 2807880 (June 20, 2017). These six distinct ecosystems located in Montana, Idaho, Wyoming, and Washington represent just two percent of grizzly bears' historic range in the lower-48 states. *All. for Wild Rockies v. Cooley*, 661 F. Supp. 3d 1025, 1030 (D. Mont. 2023). Idaho encompasses portions of four designated recovery zones in the Selkirk, Cabinet-Yaak, Greater Yellowstone, and Bitterroot ecosystems. U.S. Fish and Wildlife Serv.,

SPECIES STATUS ASSESSMENT (SSA) FOR THE GRIZZLY BEAR IN THE LOWER-48 STATES: A BIOLOGICAL REPORT 62 (Jan. 2021), https://ecos.fws.gov/ServCat/DownloadFile/196991.[4]

The Selkirk ecosystem comprises northwestern Idaho, northeastern Washington, and southeastern British Columbia. U.S. Fish and Wildlife Serv., BIOLOGICAL AND CONFERENCE OPINION FOR THE WILDLIFE DAMAGE MANAGEMENT ACTIVITIES IN THE STATE OF IDAHO 41 (July 1, 2014), Third Proulx Decl., Ex. C. (Dkt. 68-6 at 121.)[5] It includes about 1,080 square miles in the U.S. portion and about 875 square miles in the Canadian portion of the recovery zone. *Id.* The habitat is contiguous across the border with Canada and radio-collared bears are known to move back and forth across the border. *Id.*

The Cabinet-Yaak ecosystem covers 1,900 square miles of forested and mountainous habitat occupied by grizzly bears and covers portions of northwestern Montana and northeastern Idaho. *Id.* The grizzly bear populations in the Cabinet-Yaak ecosystem are connected to populations of grizzly bears to the north of the United States border with Canada, as interchanges of radio-collared bears across the border have been documented. *Id.*

The Greater Yellowstone ecosystem includes northwestern Wyoming, southwestern Montana, and eastern Idaho. *Id.* (Dkt. 68-6 at 120); SSA FOR GRIZZLY

---

[4] The map depicting Grizzly Bear Recovery Zones referenced in Plaintiffs' amended complaint and Defendants' answer may be found on the FWS's website, www.fws.gov, and accessed at: https://www.fws.gov/media/grizzly-bear-recovery-zones-and-estimated-distributions-0. The same map is attached as Ex. A to the Scrimshaw Declaration. (Dkt. 6-13.) Excerpts of the 2022 SSA for Grizzly Bear in the Lower-48 States are attached as Ex. 1 to the Qui Declaration, Docket 54.

[5] The Biological and Conference Opinion will be referred to as "BiOp."

BEAR at 56 (2022), Qui Decl., Ex. 1. (Dkt. 54.) It generally refers to the larger ecological system containing and surrounding Yellowstone National Park. SSA FOR GRIZZLY BEAR (2022) at 63. (Dkt. 54.)

The Bitterroot ecosystem is located in the Bitterroot Mountains of east central Idaho, and a small portion of Western Montana. BiOp at 41; SSA FOR GRIZZLY BEAR (2022) at 37, 56, 69. (Dkt. 68-6 at 121; Dkt. 54 at 12, 22, 35.)[6]

As of 2020, there was an estimated number of at least 1,923 individual grizzly bears in the lower-48 states (727 in the Greater Yellowstone Ecosystem, 1,092 in the North Continental Divide Ecosystem, approximately 60 in the Cabinet Yaak Ecosystem, and a minimum of 44 in the U.S. portion of the Selkirk Ecosystem). SSA FOR GRIZZLY BEAR (2022) at 61. (Dkt. 54 at 27.) *See also* Decl. of Oelrich ¶ 5. (Dkt. 19-5) (Idaho contains a grizzly bear population in the Panhandle, which encompasses the Selkirk and Cabinet-Yaak Ecosystems, and Game Management Unit (GMU) 1.)

The U.S. Fish and Wildlife Service identifies grizzly bear distribution in Idaho as entirely excluding the Idaho Department of Fish & Game's (IDFG) Salmon and Clearwater regions, portions of which are within the Bitterroot Ecosystem. SSA FOR GRIZZLY BEAR (2022) at 60, 62 (Dkt. 54 at 26, 28.) Although the grizzly bear population in the Bitterroot Ecosystem is considered functionally extirpated, grizzly bears have been seen in the area in the past 15 years. SSA FOR GRIZZLY BEAR (2022) at 55, 60, 69 (grizzly

---

[6] The Bitterroot Ecosystem is also one of the largest contiguous blocks of Federal land in the lower-48 states and "contains two wilderness areas which themselves make up 'the largest block of wilderness habitat in the Rocky Mountains south of Canada.'" *All. for Wild Rockies*, 661 F. Supp. 3d at 1030.

bear sightings within the Bitterroot Ecosystem confirmed). (Dkt. 54 at 21, 26, 35); *All. for Wild Rockies*, 661 F. Supp. at 1030; *WildEarth Guardians v. United States Forest Serv.*, No. 1:19-cv-00203-CWD, 2023 WL 2586139, at *9 (D. Idaho Mar. 21, 2023) (In June of 2019, a grizzly bear was spotted during the hunting season in the Kelly Creek drainage of the Nez Perce-Clearwater National Forests in Idaho, within the Bitterroot Ecosystem. Another grizzly bear was killed in 2007 by a hunter seeking black bears and using bait in the North Fork Clearwater watershed, located in the Bitterroot Mountains); *see also* Oelrich Decl. ¶ 5; Third Servheen Decl. ¶ 10, Ex. E. (Dkt. 19-5, 68-9 at 5, 28.) There have been a few verified observations of grizzly bears in the Clearwater Region and two verified grizzly bear sightings in the Salmon Region that have been suspected to be sub-adult males, which are highly transient. Def.s' SOF ¶ 22; Pl.s' SODF ¶ 22; Second Oelrich Decl. ¶ 16. (Dkt. 60-1, 62, 70.)

Grizzly bear populations and wolf populations in Idaho overlap in Game Management Unit 1 (GMU1)[7] (which includes the Idaho portions of the Cabinet Yaak and Selkirk Recovery Zones) and in the Greater Yellowstone Recovery Area, including some lower density periphery. Second Oelrich Decl. ¶ 18, Ex. M. (Dkt. 60-1). Grizzly bear range has been expanding in these areas. SSA FOR GRIZZLY BEAR (2022) at 60.

---

[7] GMU1 encompasses the area of the Idaho Panhandle north of Sandpoint. Oelrich Decl., Ex. J (map depicting Big Game Hunting Units). (Dkt. 19-7 at 32.)

(Dkt. 54 at 26.) Also, grizzly bears are more likely to encounter traps in GMU1. Third Proulx Decl., Ex. E. (Dkt. 68-6 at 214.)[8]

IDFG and federal records, including statewide and regional camera surveys for other species, indicate grizzly bear populations are greatest in the Greater Yellowstone Area, "with a demographic monitoring area identified by U.S. Fish and Wildlife Service as suitable habitat (Idaho Game Management Units 60, 61, 62, and 62A) and the Selkirk, Cabinet, and Purcell Mountains in Game Management Unit 1." Boudreau Discl. ¶ 40. (Dkt. 52-9 at 10.)[9]

IDFG has conducted remote camera surveys for wolf monitoring from 2019 - 2021, operating from the mid-summer to fall. Oelrich Decl. ¶ 19. (Dkt. 19-5.) [10] In 2019, IDFG obtained images from 792 cameras. In 2020, IDFG obtained images from 734 cameras, and in 2021, IDFG obtained images from 737 cameras. These cameras captured images of grizzly bears in the northern part of the Panhandle and in the Greater Yellowstone Area in each of these years. Only one other grizzly bear image was captured outside of these two areas. In 2019, a grizzly bear determined to be Bear 927, was found near the Idaho-Montana border in the Clearwater Region. This grizzly bear returned to

---

[8] Ex. E is a copy of Whitmans's "Methods of reducing the possibility of non-target species while wolf trapping in north Idaho." Whitman is identified as an employee of the IDFG. Third Proulx Decl. ¶ 25. (Dkt. 68-5 at 11.)

[9] At the time he authored his expert disclosure, Toby Boudreau was an employee of the IDFG and was serving as a Program Coordinator in IDFG's Wildlife Bureau. Boudreau Discl. (Dkt. 52-9 at 2.)

[10] Katherine Oelrich is the Large Carnivore Wildlife Staff Biologist at the IDFG.

Montana to den in 2019 and has not returned to Idaho as of 2022.[11] Oelrich Decl. ¶ 19, Ex. L. (Dkt. 19-7 at 12, 34.) In 2022, IDFG deployed over 750 cameras. Second Oelrich Decl. ¶ 18, Ex. P. (Dkt. 60-1.) These cameras captured images of grizzly bears in the Panhandle and Greater Yellowstone Area. *Id.* No grizzly bear was detected on IDFG statewide wolf cameras in the Clearwater or Salmon Regions in 2022. *Id.*

Grizzly bears enter winter dens to hibernate and, while in dens, are not vulnerable to wolf trapping and snaring. Third Servheen Decl. ¶ 11. (Dkt. 68-9.) *See also* Boudreau Dep. 114:16 – 22 (testifying that certain precautions are not important when trapping on public land during the grizzly bear denning season). (Dkt. 52-10.) Grizzly bears in the contiguous United States spend 4 to 6 months in dens, typically beginning in October or November. BiOp at 42. (Dkt. 68-6 at 122.) Grizzly bears can hibernate for as long as 7 months. *Id.* The grizzly bear non-denning season is defined as the period between March 1 to November 30. Qui Decl., Ex. 5. (Dkt. 54 at 86.) [12] However, according to Plaintiffs' expert, Christopher Servheen, Ph.D., radio-tracking data from multiple studies over many years demonstrates that some female grizzly bears have yet to enter their dens into mid-December and some male grizzly bears are still out of their dens into early January, particularly in years of poor snowpack and warmer temperatures as the State of Idaho is beginning to see with ongoing climate change. Third Servheen Decl. ¶ 11. (Dkt. 68-9.)

---

[11] Bear 927 was radio-collared and monitored. Oelrich Decl., Ex. L; Second Oelrich Decl., Ex. P. (Dkt. 19-7, 60-1.)

[12] Idaho does not dispute either the preceding statements concerning grizzly bear denning habits, or Servheen's statement that grizzly bears are not vulnerable to traps and snares while hibernating.

Den exit is earliest for males, who may exit their winter dens in late February or early March. *Id.* By mid-March, approximately 50% of males and 20 - 30% of females have emerged from their dens. *Id.*[13]

Idaho has long protected the rights of its citizens to hunt, fish, and trap by traditional methods as a preferred means of managing wildlife. Idaho Const. art. I, § 23. The Idaho Fish and Game Commission has authorized members of the public to trap wolves since 2011[14] in various "proclamations" referred to as "seasons and rules." Oelrich Decl. ¶ 9, Exs. A – I. (Dkt. 19-5, 19-6, 19-7.) *See also* Idaho Code § 36-105(3); IDAPA 13.01.07.100; IDAPA 13.01.16.750.02. Idaho recreational wolf trappers have also had the ability to trap since 2011 in occupied grizzly habitat. Oelrich Decl. ¶ 10.

Generally speaking, the laws that took effect on July 1, 2021, in conjunction with the trapping and snaring rules set by proclamation, establish a year-round trapping season for wolves on private property;[15] allow for the unlimited purchase of wolf tags;[16] and, continue the authorization for trapping and snaring in grizzly bear habitat. Idaho Fish and

---

[13] Defendants did not object to the admissibility of Servheen's statements concerning radio tracking data, or the effect of climate change upon grizzly bear denning habits. (Dkt. 73.)

[14] Gray wolves in the Northern Rocky Mountains were removed from the endangered species list on May 5, 2011. *See Defs. of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1228 (D. Mont. Aug. 5, 2010); Section 1713, Pub. L. 112-10, 125 Stat. 38 (Apr. 15, 2011). Thereafter, Idaho Fish and Game managed wolves as big game animals, and set hunting seasons. Idaho Fish and Game, WOLF MANAGEMENT BACKGROUND, https://idfg.idaho.gov/public/wildlife/wolves (follow "Wolf Management Background" hyperlink).

[15] Recreational trappers wishing to trap on private land must comply with trespass laws, as well as any specific restrictions private property owners may have for trapping on their property. Oelrich Decl. ¶ 16a. (Dkt. 19-5.) *See also* Idaho Code §§ 36-201(3), 36-1603.

[16] Prior to 2020, the number of wolf trapping tags varied. In 2020, a wolf trapper could trap up to thirty wolves. With the legislative change in 2021, wolf tags became unlimited. Idaho Code § 36-408.

**MEMORANDUM DECISION AND ORDER - 11**

Game, *F&G Comm'n Amends Wolf Hunting and Trapping Seasons to Align with New State Law* (Press Release, June 17, 2021, 2:11 PM MDT), https://idfg.idaho.gov/press/fg-commission-amends-wolf-hunting-and-trapping-seasons-align-new-state-law. *See also* Idaho Code § 36-408 ("no limit to the number of wolf tags that an individual can purchase."); Idaho Code § 36-201 ("Wolf trapping season shall be open year-round on all private property…."); Second Oelrich Decl. ¶ 4. (Dkt. 60-1.) ("The length of public land trapping seasons for [Game] Unit 1 (foothold trapping and snaring) and Units in the Greater Yellowstone Area (60, 61, 62, and 62A) (foothold trapping only) remain restricted to November 15 – March 31.").[17]

For the 2023 – 2024 gray wolf hunting and trapping season, recreational trappers were permitted to trap on public land beginning on November 15, and ending on March 31. 2023 – 2024 Gray Wolf Hunting & Trapping Seasons and General Rules, Second Oelrich Decl., Ex. M. (Dkt. 60-1.) There is, therefore, some overlap between the grizzly bear non-denning season and wolf trapping in Idaho. Boudreau Dep. 114:23 – 25. (Dkt. 52-10.) The use of bait[18] to lure wolves to traps is permissible. Second Oelrich Decl., Ex.

---

[17] Idaho's rules are more nuanced than the general summary set forth above. However, in deciding the motions for summary judgment, the Court does not find the minutia of Idaho's rules material. The Declaration of Katherine Oelrich, the Large Carnivore Wildlife Staff Biologist at the Idaho Department of Fish and Game, contains a detailed recitation of the evolution of Idaho's recreational wolf trapping seasons, the type of gear permitted and when, and the current rules for the Panhandle, Upper Snake, Clearwater, Salmon, and Greater Yellowstone regions. Oelrich Decl. ¶ 10, and Exs. A - J. (Dkt. 19-5, 19-6, 19-7.) Oelrich submitted a second declaration setting forth the updates to Idaho's recreational trapping seasons and general rules for 2023 – 24. Second Oelrich Decl. ¶ 4 - 6, Exs K, M. (Dkt. 60-1.) *See also* Def.'s SOF ¶¶ 3, 4, 6; Pl.s' SODF ¶¶ 3, 4, 6. (Dkt. 62, 70.)

[18] Bait for trapping is defined as "any animal parts; except bleached bones or liquid scent." Second Oelrich Decl. Ex. M.

M. Grizzly bears are attracted to meat-based lures. Boudreau Dep. 113:20 – 114:15. (Dkt. 52-10.)

Idaho requires that "all appropriate fish and game education requirements" be met before issuance of a tag or permit. Idaho Code § 36-408. The 2023-24 Gray Wolf Hunting & Trapping Seasons & General Rules require persons trapping for wolves to possess a valid trapping license, a Wolf Trapper Education course validation, and wolf tag(s). Second Oelrich Decl., Ex M. (Dkt. 60-1 at 9); *see also* Idaho Code § 36-408; Idaho Fish and Game, *2023 Idaho Big Game Seasons & Rules Brochure* at 81 - 83, https://idfg.idaho.gov/rules/big-game (follow "download full brochure") [https://perma.cc/DPK4-EDDX] . An Idaho trapper may complete in-class training in 16 hours, and class participants are not required to go out into the field or practice physically setting a trap or snare in class. Boudreau Dep. 39:5 – 6; 40:1-24. (Dkt. 52-10.)

There is some risk of capturing a grizzly bear by use of foothold traps, neck snares, and body snares in occupied grizzly bear habitat. Fish and Wildlife Services determined that Idaho Wildlife Services' (WS) trapping activities[19] using foothold traps, foot snares, and neck/body snares in occupied grizzly bear habitat while bears are not hibernating (i.e., between March 16 and November 30) could result in the trapping of a grizzly bear. BiOp at 47 - 49. (Dkt. 68-6 at 127, 128, 129.) FWS has acknowledged that WS in Idaho has never captured a grizzly bear in a foothold trap, foot snare, or neck snare

---

[19] Wildlife Services, in coordination with Idaho Fish and Game, utilizes traps and snares while bears are not hibernating (i.e., between March 16 to November 30) as part of active damage management operations. BiOp at 47 – 49. (Dkt. 68-6.)

when trapping for wolves in grizzly bear habitat. BiOp at 48, 49. (Dkt. 68-6 at 128, 129.)[20] However, based upon FWS's 20 year review of capture data, "there is no reason to suggest [non-target capture of a grizzly bear] could not happen in Idaho." BiOp at 47 – 49. (Dkt. 68-6 at 127 - 129.) Accordingly, based upon data from Wyoming and Montana, FWS estimates that, in any 20 year period, 1 grizzly bear may be caught in a foothold trap; 1 grizzly bear may be caught in a foot snare;[21] and 1 grizzly bear may be caught and killed by a neck/body snare. *Id.* FWS issued an ITS to WS in Idaho for the project. BiOp at 52. (Dkt. 68-6 at 132.)

Intervenors agree that the risk of capturing a grizzly bear in a trap or snare is not zero. Idaho trappers Justin Webb and Michael Ward explain that, although a bear has never ended up in their snares, the "odds are slim" that a bear would be caught, and if so, it would "pop the breakaway device and escape unharmed." Webb Decl. ¶ 13; Ward Decl. ¶ 14 – 18 (Dkt. 66-4.) Ward has never caught a bear[22] in a snare due primarily to the timing of their use, but also loop size. Ward Decl. ¶ 18. (Dkt. 66-4.) Webb and Ward

---

[20] FWS indicated that "WS, nationwide, has only caught one grizzly bear in a neck snare in the past 20 years. In 2003, a young female grizzly bear in Wyoming was caught in a neck snare and died." BiOp at 49. (Dkt. 68-6 at 129.) Wildlife Services has also accidentally captured a grizzly bear in a foot snare in Wyoming, and six grizzly bears in foothold traps in Wyoming and Montana. BiOp at 48. (Dkt. 68-6 at 128.)

[21] Foot snares are limited in their use and may be used for agency trapping purposes, but not by recreational trappers. Boudreau Discl. ¶ 43. (Dkt. 52-9 at 11.) Rather, Idaho licensed trappers may use a range of wolf foothold traps and neck snares. *Id.* ¶ 44. Foothold traps (also written as foot hold or foot-hold) are synonymous with leghold traps. Missouri Dep't of Conservation, *How Do Traps Work*? https://mdc.mo.gov/hunting-trapping/trapping (follow "How Do Traps Work?") [https://perma.cc/H2ZY-JW4L]

[22] Ward did not differentiate between black bear and grizzly bear.

**MEMORANDUM DECISION AND ORDER - 14**

also concur that it would be "extremely unlikely" that a grizzly bear would be caught in a foothold trap. Webb Decl. ¶ 14; Ward Decl. ¶ 14 – 18.

Toby Boudreau, who currently serves as the technical advisor to the Director of the Interagency Grizzly Bear Committee, and was formerly with IDFG,[23] confirmed that Idaho's recreational trapping and snaring laws and rules will not prevent nontarget captures of grizzly bears in wolf traps. Boudreau Dep. 27:14-17; Boudreau Decl. ¶ 3 – 4. (Dkt. 50-10; 60-2.) Certain equipment modifications are recommended, therefore, to avoid nontarget capture.

For instance, although Idaho allows recreational use of wolf foothold trap sizes up to and including 9 inches, the MB-750, which is recommended during trapper education classes, has an inside jaw spread of 7 1/16 inches. Boudreau Decl. ¶ 45; Boudreau Dep. 27:20 – 28:15; Second Oelrich Decl., Ex. M. (Dkt. 52-9 at 11; 52-10; 60-1 at 11.) The MB-750 also has offset jaws, laminated jaws, and a center swivel. Boudreau Dep. 28:4–8; 61:17–21. (Dkt. 52-10.) Despite these modifications, Boudreau admits that the MB-750 is capable of capturing a grizzly bear. Boudreau Dep. 29:10 – 21, 30:3 – 5; 80:3 - 12. (Dkt. 52-10.) Idaho also does not dispute that grizzly bears have been captured in traps smaller than 9 inches. Pl. SOF ¶ 8; ID SODF ¶ 8. (Dkt. 53, 61.) Foothold traps with a 9-inch inside jaw spread are capable of causing toe fractures and toe amputations in grizzly bears. Third Niemeyer Decl. ¶ 9; Walrath Decl. ¶ 19.[24] (Dkt. 68-3, 60-3.)  However,

---

[23] *See* note 9, supra.

[24] Nicole Walrath, DVM, Idaho's expert, stated she observed loss of toes in some cases related to venous return from foot and toe catches from use of foothold traps.

Idaho's rules do not require offset or laminated jaws for wolf traps, and Idaho recreational trappers can choose among a variety of foothold traps considered lawful in Idaho. 2021-2022 Gray Wolf Trapping Rules at 80–82, Qiu Decl., Ex. 7; Boudreau Dep. 59:11–13; 2023 – 2024 Gray Wolf Hunting & Trapping Seasons & General Rules, Oelrich Decl., Ex. M; Pl.s' SOF ¶ 13. (Dkt. 54, 52-10, 53, 60-1.)

Snares set to target gray wolves may also capture a grizzly bear. Second Boudreau Decl. ¶ 17. (stating snares are "not likely" to capture a grizzly bear) (Dkt. 60-2.) Equipment modifications to snares include loop stops and breakaway devices. Boudreau Dep. at 62:17–22. (Dkt. 52-10.) Idaho prohibits the placing of any ground set snare without either a break-away device or a cable stop incorporated within the snare loop, but does not require both. Second Oelrich Decl., Ex. M. (Dkt. 60-1 at 11.) *See also* 2021-2022 Gray Wolf Trapping Rules at 80–82, Qiu Decl., Ex. 7; Boudreau Dep. 59:11–13; Pl.s' SOF ¶ 13 (stating that Idaho rules require either a loop stop or a breakaway device for wolf snares, but not both). (Dkt. 54, 52-9, 53.) Loop stops limit the minimum loop size a snare may close to when pulled by a captured animal, and breakaway devices allow non-target animals, including grizzly bears, to break the snare if sufficient force is placed on the cable. Boudreau Discl. ¶¶ 19, 83. (Dkt. 52-9.) Neither one of these equipment modifications reduce the likelihood of recreational wolf trappers from capturing a  grizzly bear. Boudreau Dep. 49:16–19; 77:7–11; Second Boudreau Decl. ¶ 50; Niemeyer Discl. ¶ 21; Proulx Discl. ¶ 15; Vickers Discl. ¶¶ 12–13; (Dkt. 52-10, 60-2, 68-3, 68-5, 68-7.) In fact, Toby Boudreau testified that loop stops on wolf snares offer no benefit to grizzly bears snared around the neck. Boudreau Dep. 77:7–11. (Dkt. 52-10.)

In 2020 in north Idaho, two grizzly bears were taken in incidents involving wolf snares. In one instance, IDFG enforcement reported a young male grizzly bear killed in Boundary County. The report noted that the bear was found with "a wolf snare very tightly around its neck and another wolf snare wrapped around its front left paw." IDFG Enforcement Report (May 2020) ("May 2020 Report"), Qiu Decl., Ex. 15. (Dkt. 54.) The report notes that the snares were "standard wolf snares with kill springs and did not have trap identification tags as required by Idaho state law." *Id.*

The second report, from August 31, 2020, details the incidental snaring of a young, male grizzly bear. IDFG Enforcement Report FG2020-E1695 (August 2020) ("August 2020 Report"), Qiu Decl., Ex. 16. (Dkt. 54.) Hunters in Boundary County killed the grizzly bear, mistaking it for a black bear. *Id.* The hunters acknowledged to IDFG Enforcement Officer Brian Johnson that two signs close to the trail where the bear was seen indicated that "This is Grizzly Bear Country" and "Hunter's [sic] Know Your Bears!" *Id.* IDFG Enforcement noted in the report that the dead grizzly bear, which had an ear tag from British Columbia, had a "wolf snare around it's [sic] neck but had managed to break the snare and survive." *Id.* at 2. The location of the bear was in the Purcell Mountains less than 10 miles away from both the Montana border and the Canada border (British Columbia). Johnson Decl. ¶ 12. (Dkt. 19-3.) The snare "would have eventually resulted in death" had the bear not been shot. E-mail from Wayne Kasworm, FWS, to Tracy Melbihess *et al.*, FWS (Nov. 19, 2022, 14:26 MST), Qiu Decl., Ex. 17; Servheen Discl. ¶ 16 ("This grizzly bear would never have been able to get this wolf snare off its neck."). (Dkt. 54, 68-9.)

On May 25, 2012, Bryan Aber, a professional IDFG trapper, caught a grizzly bear in the Caribou-Targhee National Forest (Game Unit 62A) in a foothold trap when targeting wolves. Aber Decl. ¶ 4. (Dkt. 19-1). Pl.s' SOF ¶ 16; Def.s' SOF ¶ 16.

The snares found on the two grizzly bears in 2020 were not legal sets under Idaho's rules. Def.s' SODF ¶ 22. Johnson Decl. ¶¶ 9, 13, 16. (Dkt. 19-3.) Johnson, the investigating officer for IDFG for both incidents, states in his declaration that the snares found on the bear located on May 3, 2020, were unlawful in Idaho because they were:

> (1) set within 30 feet of visible bait (elk parts); (2) they did not contain breakaway device or a cable stop incorporated in the loop of the snare; and (3) they did not have identification tags indicating they were set by a licensed trapper. IDAPA 13.01.16.450.03; IDAPA 13.01.16.100. The condition of the grizzly bear and other observation of the site also indicated the snares were not checked at least once every 72 hours, and the capture was not reported to the Department as required by Commission rules.

Johnson Decl. ¶ 3. (Dkt. 19-3.)

The snare found on the bear killed on August 31, 2020, "did not contain a breakaway device or a cable stop incorporated in the loop of the snare, which would make it unlawful to place in Idaho as a ground set snare." Johnson Decl. ¶ 16. (Dkt. 19-3.)

The grizzly bear caught in 2012 by regional wildlife biologist Bryan Aber was released with minor injuries and radio collared as Bear 706. Aber Decl. ¶ 6. (Dkt. 19-1.) She became a subject of the Grizzly Bear Study Team's ongoing research and monitoring for grizzly bears in the Greater Yellowstone Ecosystem. *Id*. ¶¶ 6 – 9.

**MEMORANDUM DECISION AND ORDER - 18**

Idaho requires recreational trappers to report all catches of non-target wildlife, whether alive or dead. IDAPA 13.01.16.800.01. Recreational trappers are subject to ESA liability for taking a grizzly bear and face prosecution and fines. Boudreau Dep. 44:8-12. (Dkt. 52-10.) Based on data on wolf trapping, including data on trapping in occupied grizzly bear habitat, Idaho has no record of any reported captures of grizzly bears incidental to otherwise lawful recreational wolf trapping in Idaho since Idaho opened wolf trapping seasons in 2011. Oelrich Decl. ¶ 6; Second Oelrich Decl. ¶ 13. (Dkt. 19-5, 60-1.)[25] However, trappers do not always report non-target captures, and grizzly bears are able to break trap chains or cable snares and leave the site. Third Proulx Decl. ¶¶ 15 – 16; Third Servheen Decl. ¶ 18. (Dkt. 68-5, 68-12.)[26] Idaho acknowledges also that persons engaged in illegal snaring may not report their captures. Pl.s' SOF ¶ 16; Def.s' SOF ¶ 16. Neither of the two incidents in 2020 were reported by the trapper who set the snare(s). May 2020 Report, August 2020 Report, Qiu Decl., Exs. 15, 16. (Dkt. 54.)

In 2003, government agency trappers in Wyoming caught and killed a young grizzly bear female in a wolf snare. BiOp at 49, Qiu Decl., Ex. 8. (Dkt. 54.) Pl.s' SOF ¶ 18; Def.s' SODF ¶ 18.

In Montana, a Montana Fish, Wildlife & Parks professional trapper accidentally

---

[25] Plaintiffs dispute this fact with argument – by attacking the "characterization that there are no documented captures of grizzly bears in wolf traps or snares," and point to the documented 2020 grizzly bear deaths.

[26] Idaho does not dispute these opinions by Proulx and Servheen.

**MEMORANDUM DECISION AND ORDER - 19**

caught a grizzly bear in a wolf foothold trap in 2015. Niemeyer Discl. ¶ 13. (Dkt. 68-3.) Pl.s' SOF ¶ 19; Def.s' SODF ¶ 19.

In Alberta, Canada, a grizzly bear was caught in a snare designated for "wolves that had depredated livestock" in August 2011. Proulx et al. 2015 at 60, Qiu Decl., Ex. 12. (Dkt. 54.) Pl.s' SOF ¶ 20; Def.s' SODF ¶ 20.

In 2019, a grizzly bear was photographed in Idaho that appeared to have a neck snare wound/scar. E-mail from James Jonkel, Montana Fish, Wildlife & Parks, to Ken McDonald, et al., Montana Fish, Wildlife & Parks (Jan. 27, 2021, 09:19:37 MST), Qui Decl., Ex. 18. (Dkt. 54.)[27]

In April of 2012, a large adult male grizzly bear was inadvertently captured in a wolf trap by a professional trapper from APHIS Wildlife Services on the Flathead Indian Reservation in Montana. Servheen Decl., Ex. F. (Dkt. 68-10.)

Between July 1, 2014, and December 2023, Idaho trappers self-reported capturing 5,584 non-target animals. Am. Williams Decl. ¶ 6. (Dkt. 91.) Over this period, 37 bears were reportedly captured. *Id.* Ex. 1. The report simply says "bear," with no indication whether it was a grizzly bear or black bear. Katherine Oelrich confirms that trappers who caught black bears held a wolf tag. Oelrich Dep. 80:12 – 23. (Dkt. 52-11.) Second Oelrich Decl. ¶ 2. (Dkt. 60-1.) Black bears and grizzly bears "generally use…the same type of habitats and they generally have the same type of food source." Oelrich Dep. 47:9 – 16. (Dkt. 52-11.)

---

[27] This exhibit references Katmai Nat'l Park, *Mission to Save Grizzly From a Wolf Snare- Alaska*, YouTube (Dec. 8, 2017), https://youtu.be/Wh_hent6RjA.

## LEGAL STANDARDS

**1.      Summary Judgment Standard**

Summary judgment is not a "disfavored procedural shortcut." Rather, it is an important procedure designed to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is appropriate when the moving party can demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) and (c); *Adickes v. S.H. Kress & Co*., 398 U.S. 144 (1970). The party moving for summary judgment has the initial burden of establishing, through admissible evidence in the form of depositions, answers to interrogatories, admissions, affidavits or documentary evidence, that there is an absence of evidence to support the opposing party's case and the moving party is entitled to judgment as a matter of law. *Celotex Corp*., 477 U.S. at 325.

The factual record along with any reasonable inferences that may be drawn therefrom must be examined in the light most favorable to the party opposing summary judgment. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Once the moving party meets its burden, the party opposing the motion must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248–49 (1986); *In re Oracle Corp. Sec. Litig*., 627 F.3d 376, 387 (9th Cir. 2010). The party opposing the motion may not rest upon the mere denials of his pleadings to avoid summary judgment. Fed. R. Civ. P. 56(e); *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 387.

Rather, the nonmoving party must come forth with evidence from which a jury could reasonably render a verdict in the nonmoving party's favor. *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 387.

Here, where the parties have filed cross motions for summary judgment, the Court "must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001). Summary judgment is inappropriate if disputes remain as to material facts. *Anderson*, 477 U.S. at 250; *Norton v. Maximus Inc.*, No. 1:14-cv-030 WBS, 2016 WL 6211281, at *2 (D. Idaho May 19, 2016). Therefore, the legal standard remains the same—each party has the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law. *Am. C.L. Union of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003). In other words, cross motions are evaluated independently, giving the nonmoving party in each instance the benefit of all reasonable inferences. *Id.* The denial of one motion does not require the grant of the other—the Court must still determine whether disputes as to material facts are present. *Fair Housing Council of Riverside County, Inc.*, 249 F.3d at 1136.

In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. However, conclusory and speculative testimony do not raise genuine issues of fact and is insufficient to defeat

summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## 2.    Endangered Species Act

Congress enacted the ESA in 1973 to "provide for the conservation, protection, restoration, and propagation of species of fish, wildlife, and plants facing extinction." *Wyo. Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224, 1231 (10th Cir. 2000) (quoting S. Rep. No. 93-307, at 1 (1973), reprinted in 1982 U.S.C.C.A.N. 2989). The ESA provides various levels of protection depending upon how a species is classified. The three ESA classifications are: (1) endangered, (2) threatened, and (3) experimental populations. *See* 16 U.S.C. §§ 1538(a), 1539(j). "Endangered" species are entitled to the highest level of protection. *Animal Welfare Inst. v. Martin*, 588 F.Supp.2d 70, 97-98 (D. Me. 2008). A threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). Grizzly bears are classified as threatened under the ESA. Amendment Listing the Grizzly Bear of the 48 Conterminous States as a Threatened Species, 40 FR 31734-0140; 50 C.F.R. § 17.40(b).

The purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of endangered species and threatened species." 16 U.S.C. § 1531(b). To help achieve this purpose, the ESA authorizes citizen suits "to enjoin any person…who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof…." 16 U.S.C. § 1540(g)(1)(A).

Section 1538(a)(1)(B) of the ESA makes it a violation of the ESA for any person to "take" an endangered species. In addition, the ESA makes it unlawful for any person "to attempt to commit, solicit another to commit, or cause to be committed, any offense defined" in the ESA. 16 U.S.C. § 1538(g). The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." *Id*. § 1532(19). "Take is defined…in the broadest possible manner to include every conceivable way in which a person can take or attempt to take any fish or wildlife." S. Rep. No. 93-307, at 7 (1973); *see also Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon*, 515 U.S. 687, 703 – 04 (1995) (citing Senate and House Reports indicating that "take" is to be defined broadly).

The Secretary of the Interior (Secretary) defines "harm" as follows:

> *Harm* in the definition of "take" in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.

50 C.F.R. § 17.3. *See also Sweet Home*, 515 U.S. at 695 – 701 (upholding the regulation as a reasonable interpretation of the statutory language). The term "person" includes "any officer, employee, agent, department, or instrumentality…of any State, municipality, or political subdivision of a State…[or] any State municipality, or political subdivision of a State…." 16 U.S.C. § 1532(13).

Regulations promulgated by the United States Department of Interior forbid the take of grizzly bears, except in certain specified circumstances. 16 U.S.C. § 1538(a)(1)(G),

50 C.F.R. § 17.40(b)(1)(i)(A).[28] Thus, the mere trapping of a grizzly bear, even if released alive, constitutes a taking under Section 9 of the ESA. *See Ctr. for Biological Diversity v. Otter*, No. 1:14-cv-258-BLW, 2016 WL 233193, at *4 (D. Idaho Jan. 8, 2016), on reconsideration, *Ctr. for Biological Diversity v. Otter*, No. 1:14-cv-258-BLW, 2018 WL 539329 (D. Idaho Jan. 24, 2018). *See also United States v. Charette*, 893 F.3d 1169, 1171 (9th Cir. 2018) (citing regulations applicable to take of grizzly bears).

"[A] reasonably certain threat of imminent harm to a protected species[29] is sufficient to support issuance of an injunction under Section 9 of the ESA." *Defs. of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000). *See also Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1068 (9th Cir. 1996) (the ESA allows private plaintiffs to enjoin private activities that are "reasonably certain to harm a protected species."); *Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 896 F.Supp. 1170, 1180 (M.D. Fla. 1995) (finding plaintiffs met their burden of showing that the County's conduct was "reasonably likely to result" in a taking of a protected species).

16 U.S.C. § 1540(g) does not contain any requirement that claims of a future injury to wildlife be based on past injury. *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 784 (9th Cir. 1995) ("So long as some injury to wildlife occurs, either in the past, present, or future, the injury requirement of the Secretary's new

---

[28] For instance, a grizzly bear may be taken in self-defense or in defense of others; to remove a nuisance bear; or for scientific or research purposes. 50 C.F.R. § 17.40(b)(1)(i).

[29] Protected species under the ESA include both threatened and endangered species. 16 U.S.C. §§ 1538(a), 1539(j).

definition [of harm] would be satisfied.").[30] The legislative history of Section 1540(g), although sparse, indicates that Congress anticipated citizen suits to enjoin prospective injuries. *Rosboro Lumber Co.*, 50 F.3d at 785 (citing H.R.Rep. 412, 93d Cong., 1st Sess. 19 (1973) U.S.C.C.A.N. 1973, P. 979 ("citizen actions…allow any person…to seek remedies involving injunctive relief for violations or potential violations.")). However, "mere speculation" is not sufficient. *National Wildlife Fed'n v. Burlington Northern R.R.*, 23 F.3d 1508, 1512 n. 8 (9th Cir.1994).

The provisions of the ESA set forth above apply to acts by third parties that allow or authorize acts that exact a taking and that, but for the permitting or licensure process, could not take place. *Strahan v. Coxe*, 127 F.3d 155, 163 (1st Cir. 1997). *See also Ctr. for Biological Diversity*, 2016 WL 233193 at *5. In other words, the ESA "not only prohibits the acts of those parties that directly exact the taking, but also bans those acts of a third party that bring about the acts exacting a taking." *Strahan*, 127 F.3d at 163. *See also Red Wolf Coalition v. North Carolina Wildlife Resources Comm'n*, No. 2:13-cv-60-BO, 2014 WL 1922234 *7 (E.D.N.C. May 13, 2014) (finding that by authorizing trapping and hunting of coyote in a red wolf recovery area, the defendant "has increased the likelihood that a red wolf will be shot.").

---

[30] Plaintiffs cited *Puyallup Tribe of Indians v. Electron Hydro*, LLC, No. C20-1864-JCC, 2024 WL 664407, at *5 (W.D. Wash. Feb. 16, 2024) for the proposition that Plaintiffs do not need to show physical evidence of past take to prevail on summary judgment. (Dkt. 92-1.) The Court considered *Puyallup*, but did not find it necessary to rely on the same to reach the conclusion that Plaintiffs need not show past take to support a finding of future take.

Accordingly, a governmental third party such as Idaho, pursuant to whose authority an actor exacts a taking of a threatened or endangered species, may be deemed to have violated the provisions of the ESA. *Strahan*, 127 F.3d at 163.[31]

## DISCUSSION

### 1. Standing[32]

Idaho asserts that Plaintiffs do not provide evidence of injury to themselves or to grizzly bear in the lower-48 states traceable to ESA violations caused by Idaho's authorization of recreational wolf trapping and snaring. Specifically, Idaho contends that Plaintiffs' assertion of harm to its various members is based on speculative future harm that is not directly traceable to Idaho's laws and rules. Idaho also asserts that allegations of injury to pets, animals other than grizzly bears, individual members, or loved ones as a result of potential trapping injuries are insufficient to support standing.

Plaintiffs argue they have demonstrated Article III standing and point to their asserted members' religious, spiritual, conservation, aesthetic, recreational, inspirational, and scientific interests, which they allege are harmed by grizzly bear capture, injury, and mortality in state-authorized wolf traps and snares. Plaintiffs assert that injuries are

---

[31] This interpretation is distinguishable from a state's licensure of a generally permitted activity, such as operating an automobile, because it is possible for a person licensed by the state to drive a car to drive in a manner that does not risk violation of federal law. *See Strahan v. Coxe*, 127 F.3d at 163 – 64. In contrast, when a recreational trapper uses traps or snares in the manner permitted by the State and there is a risk of violating the ESA by exacting a taking, causation, while indirect, may be found. *Id.* at 164.

[32] Idaho raised the issue of standing in its response to Plaintiffs' motion for preliminary injunction. (Dkt. 19.) Having found the requisite causal connection to support the issuance of a preliminary injunction lacking on the record before the Court at that time, the Court declined to address Idaho's standing argument. Order at 23 n. 11. (Dkt. 25.)

traceable to Idaho's conduct, because a risk of taking exists even if recreational trappers comply with all applicable laws and rules.

To have standing, Plaintiffs must demonstrate an injury in fact that is concrete and particularized, as well as actual or imminent, as opposed to conjectural or hypothetical; that the injury is fairly traceable to the challenged action of the defendant; and that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Env't Servs.* (*TOC*)*, Inc.*, 528 U.S. 167, 180–81 (2000). An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). "Environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015). The inquiry is "whether Plaintiffs have shown that [an injunction] could protect Plaintiffs' aesthetic, recreational vocational, and scientific interests in grizzly bears" in the affected areas. *All. for Wild Rockies*, 661 F. Supp. 3d at 1034.

The Court finds Plaintiffs have met their burden and have standing to make their claims in this lawsuit. For instance, Náhkòxho'óxeóó'èstse-Bear Stands Last, a member of Plaintiff Global Indigenous Council, explains that he spends extensive time traveling

to and through grizzly bear habitat in Idaho to pursue photography, conservation, and Tribal advocacy work, and he plans to do so in the future. Náhkòxho'óxeóó'èstse-Bear Stands Last Decl. ¶¶ 5–7, 8, 10, 13–16 (Dkt. 6-9). He states that Idaho's recreational wolf trapping laws and rules, and the potential threat to grizzly bears that they pose, cause harm to his conservation and advocacy work, and infringe upon his religious and spiritual freedoms. *Id.* Similarly, members of the other Plaintiff organizations describe the impact of Idaho's laws and rules on their advocacy work on behalf of grizzly bears; and, how the laws and rules harm their ability to enjoy Idaho's public lands and to experience a potential grizzly bear sighting. Haverstick Decl. ¶¶ 4–9, 11–12; Macfarlane Decl. ¶¶ 4–6, 8; Torline Decl. ¶¶ 2–6, 8–11, 14–16, 18–19; Brown Decl. ¶¶ 4, 6–8, 10–11, 19–21, 27, 29, 31–32, 35; Campbell Decl. ¶¶ 2–4, 6–7; Almquist Decl. ¶¶ 2, 12–15, 18–22; Sieracki Decl. ¶¶ 5, 7–13, 15–16, 21; Stone Decl. ¶¶ 4–7 (Dkt. 6-2, 6-3, 6-4, 6-5, 6-6, 6-7, 6-8, and 6-10). Plaintiffs state that they continue to recreate and use the areas mentioned in the complaint in an effort to observe grizzly bears. And, they explain how an injunction would redress their injuries.

The Court finds Idaho conflates its merits analysis concerning causation with the jurisdictional standing inquiry. A concrete "risk" of harm to Plaintiffs is sufficient injury in fact to meet Article III's standing requirements. *Harris v. Bd. of Supervisors*, 366 F.3d 754, 761–62 (9th Cir. 2004) (noting also that a credible "threat of harm" constitutes "actual injury"). Requiring Plaintiffs to prove that a grizzly bear has actually been trapped or snared by a recreational trapper acting in compliance with Idaho's wolf trapping and snaring laws and rules confuses the jurisdictional standing inquiry with the

merits question concerning causation. *Demoruelle v. Kucharski*, 463 F. Supp. 3d 1107, 1117 (D. Haw. 2020). Further, there is no requirement that standing is contingent upon a showing of past injury to the protected species. *Id.* at 1118 (citing *Rosboro Lumber*, 50 F.3d at 786);

The Court therefore concludes Plaintiffs have met their burden and provided sufficient evidence to survive Idaho's motion for summary judgment on the issue of standing.

## 2.     Vicarious Liability

Idaho argues that the language of the ESA does not support vicarious liability under Section 9 for state and local licensing and regulatory activities. Rather, Idaho contends the only relief targeting regulatory actions is under Section 7, which is limited to federal agency licensing and other regulatory action. Alternatively, Idaho argues that recreational wolf trapping and snaring is conducted by independent actors, which absolves Idaho of liability. Plaintiffs contend that established legal authority holds to the contrary, and supports vicarious liability for state-regulated trapping and other activities by private parties.

The Court agrees with Plaintiffs and finds Idaho's arguments without merit. Persuasive authority from this Court and others establishes that private parties may maintain an action against the State and seek an injunction prohibiting the enforcement of state regulations likely to result in take of an ESA protected species, even if the licensed activity is carried out by independent actors. *See, e.g., Animal Welfare Inst. v. Martin*, 668 F. Supp. 2d 254, 256 (D. Me. 2009), *aff'd*, 623 F.3d 19 (1st Cir. 2010); *Strahan v.*

*Coxe*, 127 F.3d 155, 164 (1st Cir. 1997); *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, No. CV 23-101-M-DWM, 2023 WL 8064884 at *5 (D. Mont. 2023); *Strahan v. Sec'y, Massachusetts Exec. Off. of Energy & Env't Affs*., 458 F. Supp. 3d 76, 80 (D. Mass. 2020); *Humane Soc'y of United States v. Kienzle*, 333 F. Supp. 3d 1236, 1239 (D.N.M. 2018); *Ctr. for Biological Diversity*, 2016 WL 233193 at *5; *WildEarth Guardians v. Lane*, No. CIV 12-118 LFG/KBM, 2012 WL 6019306, at *1 (D.N.M. Dec. 3, 2012); *Animal Prot. Inst. v. Holsten*, 541 F. Supp. 2d 1073, 1078 (D. Minn. 2008); *Strahan v. Pritchard*, 473 F. Supp. 2d 230, 233 (D. Mass. 2007); *Loggerhead Turtle*, 896 F. Supp. at 1173.

Idaho argues also that the ESA does not support vicarious liability for state and local licensing and regulatory activities, because the activity is conducted by independent actors. However, where it is not possible for a recreational trapper to use their traps and snares in a manner permitted by Idaho's laws and rules without risk of violating the ESA by exacting a taking, liability may be imposed. *Strahan v. Coxe*, 127 F.3d 155, 164 (1st Cir. 1997). Nor will an injunction impose positive obligations on Idaho requiring Idaho to enforce the ESA. Rather, the effect of any ruling will be to end Idaho's continuing violation of the ESA. *Strahan*, 127 F.3d at 164. Idaho has provided no persuasive authority supporting a departure from these established authorities finding that vicarious liability may be imposed upon the State under the ESA.

Nor are Plaintiffs asking Idaho to consult under Section 7 of the ESA. Rather, Plaintiffs have asked for an injunction until Idaho obtains an Incidental Take Permit (ITP) from FWS. *See Strahan v. Sec'y, Massachusetts Exec. Off. of Energy & Env't Affs*.,

458 F. Supp. 3d 76, 94 (D. Mass. 2020) (requiring state defendants to apply for an incidental take permit because its licensing of the use of vertical buoy ropes in Massachusetts coastal waters resulted in illegal take of endangered North Atlantic right whales in violation of the ESA).

Idaho may apply for an ITP under Section 10 of the ESA. An ESA Section 10 Determination is required for non-federal entities to obtain an ITP, which is necessary when there is no federal authorization or funding to a proposed project. *See, e.g., Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, *Fla*., No. 6:95-cv-587-ORL22DAB, 2001 WL 34098649, at *1 (M.D. Fla. Feb. 12, 2001) (county applied for an incidental take permit from FWS regarding its ordinance concerning artificial beachfront lighting, which lighting was found to disrupt endangered sea turtle nesting). *See also Loggerhead Turtle*, 148 F.3d at 1239 (citing regulations applicable for obtaining an ITP for an endangered species). Section 10(a)(1)(B) of the ESA authorizes FWS to issue permits if the taking is incidental to the carrying out of an otherwise lawful activity. 16 U.S.C. § 1539(1)(1)(B). *See also* 50 C.F.R. § 17.32, 17.32(b)(1) ("[T]he Director [of the Fish and Wildlife Service] may issue a permit for any activity otherwise prohibited with regard to threatened wildlife."). And, the Court may order Idaho to apply for an ITS under Section 10 of the ESA. *Strahan*, 458 F. Supp. 3d at 95.

The Court finds Idaho has not met its burden on its motion for summary judgment on this issue. Established authority authorizes a private citizen suit against Idaho under Section 9 of the ESA premised upon vicarious liability.

3.        **Causation**

Plaintiffs argue Idaho's laws and rules violate the ESA, because a risk of taking exists even if recreational wolf trappers comply with all applicable laws and rules.[33] Idaho, on the other hand, argues that the causal link between its laws and rules and the likelihood of grizzly bear take is missing, because there have been no confirmed instances of a grizzly bear caught by recreational wolf trappers since Idaho authorized wolf trapping and snaring in 2011.

The liability determination depends on "whether a risk of taking exists if trappers comply with all applicable laws and regulations in place…." *Animal Prot. Inst. v. Holsten*, 541 F.Supp.2d at 1079. *See also Strahan v. Coxe*, 127 F.3d 155, 164 (1st Cir. 1997); *Flathead-Lolo-Bitterroot Citizen Task Force*, 2023 WL 8064884 at *5. The threat, or risk, must be "reasonably certain," and not "mere speculation." *Defenders of Wildlife*, 204 F.3d at 925; *Ctr. for Biological Diversity*, 2016 WL 233193 at *7 (citing *Burlington Northern R.R.*, 23 F.3d at 1512 n. 8). Plaintiffs need not show a significant threat to the species as a whole—the threat of a single injury to one grizzly bear is sufficient to establish a taking under the ESA. *Strahan*, 127 F.3d at 165; *Ctr. for Biological Diversity*, 2016 WL 233193, at *8.

---

[33] The Court discusses the most persuasive arguments of the parties and intervenors based on the undisputed material facts.

**MEMORANDUM DECISION AND ORDER - 33**

Upon review of the complete record before it,[34] the Court finds Plaintiffs have met their burden of demonstrating that a reasonably certain risk exists that a taking of a grizzly bear will occur even when traps and snares are lawfully set pursuant to Idaho's laws and rules. First, the Court does not find Idaho's argument that the absence of past take of a grizzly bear by an Idaho recreational wolf trapper complying with all of Idaho's laws and rules is dispositive on the record now before the Court. A review of applicable legal authorities indicates the Court should use a standard that "favors endangered species to better effectuate the purpose of the ESA." *Rosboro*, 50 F.3d at 787. *See also Animal Welfare Inst. v. Beech Ridge Entergy LLC*, 675 F.Supp.2d 540, 5632 – 64 (D. Md. 2009) (adopting a standard requiring less than absolute certainty of imminent harm to endangered species in order to succeed on a Section 9 claim for a permanent injunction).

Thus, the Court does not view the legal inquiry settled in the absence of take by Idaho licensed wolf trappers complying with each and every one of Idaho's laws and rules. Rather, the relevant inquiry is whether it is possible for trappers to use traps and snares in the manner Idaho permits without risk of violating the ESA by exacting a taking. *Humane Society of United States v. Kienzle*, No. 16-cv-0724 WJ/SMV, 2017 WL 5151305 (D.N.M. Nov. 2, 2017). Or, stated differently, the inquiry is whether Idaho has increased the likelihood that a grizzly bear will be trapped or snared by a licensed recreational wolf trapper even when trappers comply with all of Idaho's laws and rules— not whether it is possible to avoid a taking if the laws and rules are followed. *Id.*; *Red*

---

[34] The Court does not find its prior decision denying Plaintiffs' request for preliminary injunction dispositive here in light of the additional evidence before the Court.

*Wolf Coalition*, 2014 WL 1922234 at *8; *Animal Protection Institute v. Holsten*, 541 F.Supp.2d 1073, 1079 (D. Minn. 2008). The Court needs not wait until an Idaho recreational wolf trapper complying with all of Idaho's laws and rules actually reports a trapped, snared, or dead grizzly bear, as this would raise the standard to one of absolute certainty and thereby frustrate the purposes of the ESA. *Beech Ridge Energy*, 675 F.Supp.2nd at 563 – 64.

There is ample evidence in the record, including from Idaho's own witnesses, that lawfully set wolf traps and snares are reasonably likely to take grizzly bears in Idaho. It is undisputed that FWS in its 2014 BiOp concerning the effects of Idaho's wildlife damage management activities found that, as a result of trapping and snaring in grizzly bear habitat, grizzly bears could be taken. FWS's determination was based upon capture data from Wyoming and Montana, which FWS found relevant. Ultimately, FWS issued an ITS, indicating that up to four grizzly bears may be taken by WS in Idaho in any 20 year period as a result of Idaho's wildlife damage management activities. Further, there is evidence in the record that professional trappers in Idaho, Montana, and Wyoming, all with considerable experience, have caught grizzly bears in foothold traps and snares intended for wolves.

The Court recognizes that FWS's BiOp did not concern recreational trapping and snaring in Idaho. Nonetheless, there is sufficient evidence in the record that recreational wolf trappers in Idaho complying with Idaho's laws and rules are likely to take grizzly bears. Idaho recreational trappers are permitted to trap for wolves in grizzly bear habitat. Idaho trappers Justin Webb and Michael Ward, who arguably have more experience than

**MEMORANDUM DECISION AND ORDER - 35**

a recreational trapper with sixteen hours of formal trapper education, use phrases such as "extremely unlikely" and that the "odds were slim" in their written declarations. Toby Boudreau says the same. Consequently, none of Idaho's witnesses avow that the risk of grizzly bear take is zero.

Idaho argues that its trapper education course will eliminate the likelihood of any future accidental capture of grizzly bears. The Court finds Idaho's argument unconvincing. Idaho requires 16 hours of trapper education, with no requirement that trappers go into the field or practice physically setting a trap or snare. Thus, recreational trappers are likely to be less experienced than professional trappers, thereby presenting a higher risk of non-target capture.

Next, the gear used by Idaho recreational wolf trappers will not prevent take of grizzly bear. For instance, although Idaho recommends using the MB-750, a foothold trap with an inside jaw spread of 7 1/16", Idaho allows wolf foothold trap sizes up to and including 9 inches. Use of either foothold trap, however, may result in capture of a grizzly bear. The same is true of snares. Although Idaho requires either a break-away device or a cable stop incorporated within the snare loop, neither of these devices reduces the chance that a recreational wolf trapper will not take a grizzly bear.

Moreover, if a grizzly bear is caught in a trap or snare, the likelihood that a trapper may report the incident may be nullified because grizzly bears can escape the scene. Toby Boudreau states that a snared grizzly bear will more likely than not "pop the breakaway device and escape." Indeed, a grizzly bear was photographed in Idaho in 2019 that appeared to have a neck snare wound or scar. Similarly, Idaho does not dispute

**MEMORANDUM DECISION AND ORDER - 36**

Proulx's and Servheen's statements that a grizzly bear caught in a foothold trap is capable of breaking the trap chain, or Niemeyer's statement that a grizzly bear may escape the trap with amputated toes left behind. Idaho's expert, Nicole Walrath, also observed loss of toes as result of foothold traps. In either case, there would be nothing to report.

Not only this, but Idaho's reporting is woefully inadequate. In the instances when bears were reportedly captured by an Idaho wolf trapper, the non-target capture report simply states "bear." Katherine Oelrich testified in her deposition that black bears and grizzly bears use the same type of habitats and food sources. Consequently, without any evidence to indicate the type of bear captured, the Court cannot definitively rule out that none of the 37 bears reportedly captured by Idaho recreational wolf trappers was a grizzly bear. Thus, Idaho cannot avoid the implications of *Beech Ridge*, where the court reasoned take of endangered Indiana bats was reasonably certain when other bat species were reported killed by wind turbines, and Indiana bats were present in the same location as the proposed wind turbine project. *See, e.g., Beech Ridge Energy*, 675 F.Supp.2nd at 577.

In light of the current and complete record, the Court also has revisited its analysis of the two grizzly bear takings reported in 2020 in north Idaho. Although Idaho makes much of the fact that the snares were not legal sets under Idaho's laws and rules, even if they had been legal sets, they would not have prevented take of the two grizzly bears. For instance, both snares did not have a breakaway device or cable stop incorporated in the loop of the snare. But neither of these devices will prevent capture of a grizzly bear. The lack of trap identification tags, the failure to report either capture, the proximity to visible

bait, and the failure to check the site every 72 hours also would not have prevented take of these two grizzly bears.

Idaho asserts also that the grizzly bears found in May and August of 2020 were found during months when wolf trapping season was closed. However, the May 2020 Report gave no indication of the grizzly bear's time of death, or an estimate of how long the grizzly bear had survived with the snare around its neck and paw. Given that grizzly bears can break a snare and continue to survive until their eventual death from the snare, the  Court cannot assume, as Idaho does, that the grizzly bear found in May of 2020 was not snared prior to the close of the 2020 trapping season. The same is true of the bear found in August of 2020. This grizzly bear had obviously survived for some time with the snare around its neck before being shot by the two hunters.

Nor does the Court find Idaho's argument that these two grizzly bears could have been snared in Canada persuasive. In both instances, the grizzly bears were found in Boundary County, which is in Idaho's panhandle region. Grizzly bears routinely cross the border from Canada. Further, grizzly bears have been sighted extensively in the panhandle region on IDFG cameras. It is therefore just as plausible that an Idaho recreational trapper set the snares.[35] Consequently, the Court finds these two incidents persuasive evidence that Idaho recreational wolf trappers are reasonably likely to take grizzly bear even when traps and snares are lawfully set pursuant to Idaho's laws and rules. *See Loggerhead Turtle*, 896 F.Supp. at 1182; *Holsten*, 541 F.Supp.2d at 1080.

---

[35] *See*, e.g., Boudreau Dep. 67:2 – 3 (affirming that it was possible the grizzly bear was caught in Idaho.) (Dkt. 52-10.)

**MEMORANDUM DECISION AND ORDER - 38**

Idaho has also increased the risk of take. As of July 1, 2021, Idaho now permits trapping and snaring in grizzly bear habitat on private lands year round, and on public lands during periods when it is undisputed that grizzly bears are not denning. Although recreational wolf trappers must obtain permission to trap on private lands, no such restriction applies to the landowner, who can set wolf traps and snares indiscriminately. On public land, the trapping season begins on November 15 and ends on March 31, and it is undisputed that grizzly bears are out of their dens between March 1 and November 30.[36] It is undisputed that trapping and snaring seasons in Idaho overlap periods when grizzly bears are known to be out of their dens, thereby increasing the risk that a grizzly bear will be taken. Idaho has, therefore, injected itself into a position in which it may be the proximate cause of an ESA take. *Seattle Audubon Soc'y v. Sutherland*, No. C06-1608MJP, 2007 WL 1577756, at *2 (W.D. Wash. May 30, 2007).

Since July 1, 2021, Idaho has allowed trappers to purchase an unlimited number of wolf tags. While data indicates that wolf-mortality has not increased since this change,[37] this says nothing about Idaho's tacit encouragement to try to capture as many wolves as possible, leading to a plausible inference that there are more traps and snares being set, just not wolves being caught.

---

[36] With climate change, and based upon radio-tracking data from multiple studies over the years, grizzly bears have been known to enter dens as late as December, and exit as early as February. *See Flathead-Lolo-Bitterroot Citizen Task Force*, 2023 WL 8064884 at *9 (preliminarily enjoining Montana Fish, Wildlife and Parks from authorizing wolf trapping and snaring "except during the time period when it is reasonably certain that almost all grizzly bears will be in dens: January 1, 2024, to February 15, 2024.").

[37] Total wolf mortality after the 2021 legislative changes remained comparable to preceding years. Second Oelrich Decl. ¶ 8, 10, 11; Third Oelrich Decl., Ex. A. (Dkt. 60-1, 85.)

Finally, Idaho camera surveys for wolf monitoring between 2019 and 2022 show increased sightings of grizzly bears in the Selkirk, Cabinet-Yaak, and Yellowstone regions where Idaho recreational trappers are permitted to trap wolves. (Compare Dkt. 60-1 at 21 with 19-7 at 35 – 37.) GMU1, which encompasses the Selkirk and Cabinet-Yaak recovery zones, has the greatest overlap of grizzly bear and wolf populations. Grizzly bear range has been expanding in these areas as well. SSA FOR GRIZZLY BEAR (2022) at 60. (Dkt. 54 at 26.) Although grizzly bears are not believed to occupy the Bitterroot Ecosystem, there have been sightings of transient bears in that region. This ecosystem includes the Salmon and Clearwater regions. An increase in the number of grizzly bears, coupled with an expansion of the ability to trap and snare wolves in these same areas, logically results in an increased risk that a grizzly bear will be taken.

Plaintiffs have, therefore, introduced sufficient evidence to meet their burden on summary judgment. The evidence before the Court goes beyond mere speculation. The fact that an Idaho recreational wolf trapper has not reported the capture of a grizzly bear in a lawfully set trap or snare is not the focus of the Court's inquiry. The ESA does not limit the Court from issuing an injunction in the absence of past take. *Rosboro*, 50 F.3d at 786 (rejecting argument that a plaintiff must show the challenged action has caused or is presently causing an injury); *Beech Ridge*, 675 F.Supp.2nd at 577 – 78 (rejecting argument that the absence of a confirmed death of an Indiana bat at any wind power project in the country precluded a finding of causation under the ESA). Moreover, as discussed above, the Court finds the two incidents in 2020 persuasive evidence of future take.

**MEMORANDUM DECISION AND ORDER - 40**

Accordingly, the Court finds Plaintiffs have demonstrated a reasonably certain threat of imminent harm in connection with Idaho's decision to allow, and now expand, recreational trapping and snaring of wolves in areas where grizzly bears are present, and during times when grizzly bears are out of their dens.

### 4.    Remedy

Plaintiffs seek an injunction prohibiting Idaho from authorizing recreational wolf trapping and snaring in Idaho's Panhandle, Clearwater, Salmon, and Upper Snake regions until Idaho obtains an incidental take permit from the Fish and Wildlife Service. Idaho contends the remedy sought is overly broad in the absence of past take of grizzly bears caused by Idaho's laws and rules. Alternatively, Idaho contends the requested relief is inconsistent with the intended scope of *Ex parte Young's* waiver of Eleventh Amendment sovereign immunity.

Idaho's arguments are unavailing. First, "the injunctive relief authorized by the citizen suit provision, 16 U.S.C. § 1540(g), is by its very nature directed at future actions." *Rosboro Lumber*, 50 F.3d at 785. Nor does the ESA limit the issuance of an injunction in the absence of past take. *Id.* at 786 (citing H.R.Rep. 412, 93d Cong., 1st Sess. 19 (1973) U.S.C.C.A.N. 1973, P. 979 ("citizen actions ... allow any person ... to seek remedies involving injunctive relief for violations or potential violations."). The reason for authorizing injunctive relief was precisely to prevent prospective harm. *Id.* at 786. *See also Ctr. for Biological Diversity*, 2016 WL 233193 at *8, on reconsideration, 2018 WL 539329 (D. Idaho Jan. 24, 2018) (holding that, to satisfy the irreparable harm

prong of the injunction test, plaintiffs "must make a showing that a violation of the ESA is at least likely in the future.").[38]

Idaho's Eleventh Amendment immunity argument is also unavailing. The Eleventh Amendment bars suits against a state by citizens of that same state. *Papasan v. Allain*, 478 U.S. 265, 276 (1986). An exception to this arises under *Ex parte Young*, 209 U.S. 123 (1908). *Ex parte Young* "provides that the Eleventh Amendment does not bar suits for prospective injunctive relief against state officers in their official capacities, to enjoin an alleged ongoing violation of federal law." *Hason v. Med. Bd. of Cal.*, 279 F.3d 1167, 1171 (9th Cir. 2002) (citations omitted). 16 U.S.C. § 1540(g) expressly permits any person to commence a civil suit on his own behalf to enjoin any person who is alleged to be in violation of the ESA. *Pac. Rivers Council v. Brown*, No. CV 02-243-BR, 2002 WL 32356431, at *6 (D. Or. Dec. 23, 2002) (Eleventh Amendment did not bar the plaintiffs'

---

[38] In supplemental briefing, Idaho argues *Ctr. for Biological Diversity v. Otter*, No. 1:14-CV-258-BLW, 2018 WL 539329, at *3 (D. Idaho Jan. 24, 2018), is persuasive authority in their favor, as the Court found one past take of protected Canadian lynx by trappers targeting wolves was insufficient to support an injunction prohibiting trapping. The Court finds *Ctr. for Biological Diversity v. Otter* distinguishable, however. Upon reconsideration, three of the four incidents of past take of lynx were exempted from the ESA under an ITS, which exempted trappers targeting bobcats, leaving one instance of a past violation of the ESA. On that record, the Court held the plaintiffs had not shown that changes in the applicable trapping regulations were necessary to prevent future violations of the ESA by state-licensed trappers. *Id.* Here, in contrast, the two grizzly bear takings occurred recently (in 2020); there is no ITS exempting certain activities from the ESA vis-à-vis recreational wolf trapping in grizzly bear habitat; and there is evidence that the risk of future take of grizzly bears by recreational trappers targeting gray wolves is likely.

claim for declaratory relief under the ESA).[39] Plaintiffs here seek prospective injunctive relief to end Idaho's violation of the ESA by virtue of its laws and rules permitting recreational wolf trapping in grizzly bear habitat. This lawsuit is not barred by the Eleventh Amendment.

The Court does, however, question the requested temporal scope of the injunction. Plaintiffs seek an end to all wolf trapping and snaring in grizzly bear habitat until Idaho obtains an ITS. Plaintiffs must show that, absent an injunction, irreparable harm is not only possible, but likely. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 22 (2008).[40] In ESA claims, "the balance of hardships always tips sharply in favor of the endangered or threatened species." *Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1035 (9th Cir. 2005) (citing *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir.1996)). Pursuant to Federal Rule of Civil Procedure 65(d), the Court must tailor the relief

---

[39] Idaho raises an argument for the first time in its reply brief that the Tenth Amendment to the United States Constitution bars Plaintiffs' claims, because Plaintiffs seek to compel Idaho to take affirmative action to regulate recreational trapper compliance with the ESA. Reply at 10 – 11. (Dkt. 72.) But, injunctive relief will not require Idaho to take any positive action with respect to advancing the goals of the ESA. *Strahan v. Coxe*, 127 F.3d at 170 (rejecting the defendants' Tenth Amendment argument). Rather, Idaho would be required only to regulate in this area "according to federal ESA standards," and nothing more. *Id. See also Seattle Audubon Soc'y v. Sutherland*, No. C06-1608MJP, 2007 WL 1577756, at *2 (W.D. Wash. May 30, 2007) (holding that the Tenth Amendment did not pose a barrier to the plaintiffs' standing or the Court's ability to craft an injunction for violations of the ESA).

[40] Traditionally, a plaintiff seeking a permanent injunction must show: (1) irreparable injury, (2) inadequate remedies, (3) a balance of hardships, and (4) public interest. *Cottonwood Envt'l Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1088 (9th Cir. 2015). But ESA cases are different—it removes the latter three factors. *Id.* at 1090. This is because courts presume that remedies at law are inadequate, that the balance of interests weighs in favor of protecting endangered species, and that the public interest would not be disserved by an injunction. *Id.* "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities." *TVA v. Hill*, 437 U.S. 153, 194 (1978).

ordered. Fed. R. Civ. P. 65(d) (stating the order "shall be specific in terms; [and] shall describe in reasonable detail…the act or acts sought to be restrained").

Although Plaintiffs have established that future take of grizzly bears in lawfully set recreational wolf traps and snares is reasonably certain under Idaho's current laws and rules, Plaintiffs have not identified a remedy appropriately tailored to Idaho's circumstances. In examining the appropriate relief, the Court is mindful that the balance of hardships always favors preservation of the species. The Court finds the size and distribution of Idaho's grizzly bear population both supports and detracts from Plaintiffs' position.

The grizzly bear population in Idaho is estimated to reach 200, depending upon the time of year. Second Boudreau Decl. ¶ 47. (Dkt. 60-2.) The largest concentration of grizzly bears exists in Idaho's Panhandle[41] and the Greater Yellowstone Ecosystem. Second Oelrich Decl., Ex. P. (Dkt. 60-1.) The Bitterroot Ecosystem, which is within the Salmon and Clearwater regions of Idaho, is considered functionally extirpated, but there have been several transient grizzly bear sightings over the years,[42] and grizzly bear range has been expanding into this area. SSA FOR GRIZZLY BEAR at 60 (2022). (Dkt. 54.) Thus,

---

[41] Servheen stated that the current minimum population estimates for the Selkirk Ecosystem is 40 grizzly bears and for the Cabinet-Yaak ecosystem is 53 grizzly bears. Third Servheen Decl. ¶ 7, citing Kasworm et. al. 2021a and 2021b. (Dkt. 68-9.)

[42] Grizzly bear observation data from IDFG include twelve grizzly bear observation reports in the Bitterroot Ecosystem since 2012. Third Servheen Decl. ¶ 9, Exs. B and C (observation data from IDFG). (Dkt. 68-9.)

**MEMORANDUM DECISION AND ORDER - 44**

the reality of even one take could have profound effects upon Idaho's grizzly bear population.

Nonetheless, Idaho authorizes wolf trapping and snaring during periods when grizzly bears are known to be out of their dens. There is no dispute that Idaho's 2023 – 24 gray wolf trapping season, as well as prior trapping seasons, overlaps with grizzly bear non-denning periods between November 15 and November 30, and again between March 1 and March 31. Idaho does not dispute that grizzly bears are vulnerable to traps and snares after having emerged from hibernation. Nor does Idaho dispute that grizzly bears are attracted to bait used by trappers.[43] Yet, Idaho has tacitly encouraged the expansion of trapping and snaring of gray wolves by allowing trapping year round on private land, and the purchase of an unlimited number of wolf tags. Significantly, Idaho offers no defense to its decision to authorize wolf trapping and snaring during grizzly bear non-denning periods, when the greatest risk of take is present.

Plaintiffs rely primarily upon evidence that the effects of climate change cause grizzly bears to leave their dens sooner, or enter their dens later, to support their request that an injunction should prohibit recreational wolf trapping until Idaho obtains an ITS. The evidence in the record indicates that approximately 50% of males and 20-30% of females might have emerged from their dens early. But, these figures are mere generalities, and Plaintiffs did not quantify this data in any meaningful way specific to

---

[43] Grizzly bears will consume "almost any food available, including living or dead mammals or fish…Food resources are especially important during…post-denning periods…." SSA FOR GRIZZLY BEAR at 48 (2022). (Dkt. 54.)

Idaho's grizzly bear population and their distribution. Nor did Plaintiffs sufficiently establish the extent to which grizzly bear populations during the denning season overlap with locations where recreational wolf trapping is permitted under Idaho's rules. Further, there is no evidence in the record beyond the two 2020 instances of grizzly bear take that grizzly bear capture by recreational wolf trappers is as widespread as it is in other jurisdictions, or that grizzly bear take increased after 2021. *See, e.g.*, *Flathead-Lolo-Bitterroot Citizen Task Force*, 2023 WL 8064884, at *7 (in 2021 alone, Montana bear biologists noted four different bears with missing body parts likely due to trapping).

Here, then, is where the Court diverges from the holding in *Flathead-Lolo*, where the district court there issued a preliminary injunction prohibiting Montana from authorizing wolf trapping and snaring except between January 1, 2024, and February 15, 2024. 2023 WL 8064884 at 9. The Court finds Plaintiffs have not sufficiently supported their position that Idaho's recreational wolf trapping laws and rules cause a reasonably certain threat of imminent harm to grizzly bears outside of their established denning periods.

The Court also declines to order Idaho to request an ITS from FWS considering the limited injunction. The Court's injunction will return the state of affairs on private land to that which existed prior to the effective date of Idaho Code § 36-201(3) and eliminate year-round trapping and snaring on private land. The injunction will also shorten the trapping and snaring season on both public and private land by approximately 6 weeks. Idaho may, of course, request an ITS from FWS if it desires to authorize

trapping and snaring on private land year round and re-establish its historical trapping and snaring season dates in future proclamations.

Accordingly, the Court will enjoin Idaho from authorizing wolf trapping and snaring in grizzly bear habitat (which includes the Panhandle, Clearwater, Salmon, and Upper Snake regions) except during the time period when it is reasonably certain that almost all grizzly bears will be in dens: December 1 to February 28. The injunction will apply to both public and private land within these regions.

## CONCLUSION

Plaintiffs met their burden on summary judgment and established that Idaho's recreational trapping laws and rules violate the ESA. On the other hand, the Court finds Plaintiffs did not establish their entitlement to the broad remedy they seek. Instead, the Court's injunction will be limited to the period when grizzly bears are reasonably certain to be out of their dens.

## <u>ORDER</u>

**NOW THEREFORE IT IS HEREBY ORDERED:**

1) Plaintiffs' Motion for Summary Judgment (Dkt. 52) is GRANTED IN PART AND DENIED IN PART.

2) Defendants' Cross Motion for Summary Judgment (Dkt. 59) is GRANTED IN PART AND DENIED IN PART.

3) Defendant Intervenors' Motion for Summary Judgment (Dkt. 66) is GRANTED IN PART AND DENIED IN PART.

4)      The terms of the Court's injunction are as follows:

a.      Idaho Code § 36-201(3), which established a year-round wolf trapping season on all private property, is enjoined;

b.      The Director of the Idaho Department of Fish & Game and the Members of the Idaho Fish and Wildlife Commission are permanently enjoined from authorizing recreational gray wolf trapping and snaring on public or private land in grizzly bear habitat (which includes the Panhandle, Clearwater, Salmon, and Upper Snake regions) <u>except</u> during the time period when it is reasonably certain that almost all grizzly bears will be in dens—December 1 to February 28—unless an ITS is obtained from the Director of Fish and Wildlife Services;

c.      In light of the impending end of the 2023 – 2024 gray wolf trapping season, and the impracticality of suspending the current trapping season by 12 days, the Court's injunction is effective for the 2024 – 2025 gray wolf trapping season, or upon further order of the Court.

Dated: **March 19, 2024**

Candy W. Dale
United States Magistrate Judge